# MAYOR AND CITY COUNCIL OF BALTIMORE,
## ET AL. *v.* MULLER, ET AL.

[No. 202, September Term, 1965.]

270

Decided April 25, 1966.

The cause was argued before HAMMOND, HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*Donald F. Rogers* and *Simon Schonfield, Assistant City Solicitor,* with whom were *Joseph Allen, City Solicitor, Ambrose T. Hartman, Deputy City Solicitor,* and *Edward L. Coleman* on the brief, for appellants.

*Clement R. Mercaldo* and *Walter C. Herlihy,* with whom was *Samuel J. Aaron* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The appellees, William F. Muller, Eleanor H. Muller, his wife, and Roland Bounds, executor, as owners of the property in Baltimore City known as 4623-25 Bowleys Lane, filed an application on November 30, 1964 with the Building Inspection Engineer of Baltimore City, as Zoning Commissioner, for a permit to erect a gasoline filling station. This application was denied by the Zoning Commissioner and on appeal to the Board of Municipal and Zoning Appeals of Baltimore City (the Board), the application was also denied by a vote of two members in favor of granting the application and three opposed to granting it. The Board's action was, however, reversed by the Baltimore City Court (Cullen, J.) and the appellants, the Mayor and City Council of Baltimore (the City), and Helen Klemm and Spencer Avent, protesting property owners who were permitted to intervene in the Baltimore City Court, duly appealed from the order of that court.

The property 4623-25 Bowleys Lane (the subject property) is located on the southwest side of Bowleys Lane, 160 feet southeast of Roberton Avenue. It is a lot roughly shaped like a parallelogram, with irregular southeasterly and southwesterly sides, the southeasterly boundary of which has a frontage of 149.77 feet on the southwest side of Bowleys Lane. The depth of the lot is 272.94 feet (irregular). Of the 149.77 feet frontage on Bowleys Lane, 104.77 feet are in a First Commercial Use District, the northernmost 45 feet being in a Residential Use, 40 foot Height, D Area District. The First Commercial Use District appears to extend southwesterly into the subject property for approximately 115 feet.

At the time the application was filed the subject property was improved by two frame, two-story single family dwellings, semi-detached, 30 feet by 50 feet, which were to be razed. The improvements are not inhabited and have been vandalized. The property immediately adjoining the subject property on the south and the property directly across Bowleys Lane on the east are in a First Commercial Use District, but are both improved by old houses used as private residences. The house on the property to the south of the subject property is in a rundown condition and is so located that it will either have to be moved back or razed when the planned widening of Bowleys Lane is completed. There is a small shopping center on the east side of Bowleys Lane to the north of and within 300 feet of the subject property. There are rows of houses on Roberton and Chatford Avenues, the nearest public streets to the north and south, respectively, of the subject property. The representative of the Parkside Improvement Association who appeared in opposition to the application before the Board, stated that these homes are occupied by "young people who have made investments in houses and have young children." There is a church and parochial school some two and one-half blocks south of the subject property on the east side of Bowleys Lane.

The owners of the subject property have entered into a contract to sell the property to the Cities Service Oil Company; the contract is contingent upon the owners obtaining a permit to erect a gasoline filling station on the subject property.

The proposal submitted was to construct an attractive and conventional modern gasoline filling and service station with a one-story masonry and metal service building 58 feet, 8 inches by 28 feet; four 4000 gallon underground gasoline tanks, one 550 gallon waste oil tank and one 550 gallon fuel oil tank, also to be placed underground; two pump islands with four pumps; one internally lighted doublefaced identification sign, 72 inches in diameter; and, flood lights and poles. The proposed pump island would project to within 15 feet of the front lot line and the proposed identification sign would project to within 6 inches of the front lot line. The four 4000 gallon underground tanks and one of the illuminated poles would be erected in the northern portion of the subject property located in a Residential Use District.

The Building Inspection Engineer, as Zoning Commissioner, disapproved the application under the provisions of Ordinance of the City No. 711, approved May 21, 1953, as amended (the Zoning Ordinance) for three reasons: 1) the violation of the use provisions of Sections 9 and 10 of the Zoning Ordinance by the placing of the tanks and pole in the Residential Use District portion of the subject property; 2) the violation of the area or front yard provisions in the location of the pumps and other facilities within the required front yard of approximately 20 feet (the front yard of existing buildings required by Section 28 of the Zoning Ordinance); and 3) the required approval of the Board for the gasoline filling station required by Sections 37, 38 and 39 of the Zoning Ordinance, conferring original jurisdiction upon the Board in regard to filling stations, tanks and pumps.

The owners appealed to the Board and the appeal was heard on February 16, 1965. In accordance with the requirements of Section 38, the application and supporting data were submitted to the Board of Fire Commissioners, the Commissioner of Health and the Department of Transit and Traffic for investigation, recommendation and report in regard to the fire, health and traffic hazards, respectively, involved. These agencies of the City reported that in their opinion none of these hazards existed. The application and supporting data, however, had been referred to the Planning Commission and this Commission recommended that the application be disapproved stating, in part:

"We note that this property was the subject of pending Ordinance No. 485 (1964) proposing to rezone the property from the Residential Use District to the First Commercial Use District for the purpose of erecting a gasoline service station. The Board of Municipal and Zoning Appeals and the Planning Commission in their reports to the City Council recommended disapproval of the zoning change as an unwarranted commercial intrusion.

"Since the purpose of the subject appeal to your Board for an extension of commercial use is identical to the purpose of the earlier ordinance and no substantial neighborhood change has occurred, it is recommended that the application be denied."

At the hearing before the Board, the owners presented the testimony of well qualified experts indicating that in their opinion, there was a need for the proposed filling station (the nearest one being approximately one mile away), that there would be no hazards from fire, traffic, noise, glare, or disease, that there would be no resulting depreciation in the value of the neighboring property, but, on the contrary, the proposed filling station would be an improvement in the neighborhood; and, that the proposed filling station would not be detrimental to the health, morals or welfare of the community. The real estate expert testified that in his opinion it would not be economically feasible to construct houses on the subject property.

The testimony indicated that the proposed service station would usually be operated from 7:00 or 8:00 A. M. until 9:00 or 10:00 P.M., and in some cases, on Sundays.

As already indicated, the Parkside Improvement Association objected to the granting of the application. Its representative stated that the association has 425 members and there are 750 homes in the neighborhood. He further stated:

> "They are in opposition to this, based on the fact that they have attempted by forming this organization to uphold the neighborhood that is gradually being picked away and degenerating. Most of these people are young people who have made investments in homes and have young children. They are concerned as to the traffic hazard inasmuch as there is a proposed playground directly in the rear of the proposed station.
>
> "And also, there is a church-school within a short distance of the proposed garage. And they are concerned generally as to the safety of the children and to the gradual breakdown of the neighborhood, that has taken a great deal of toil and effort to retain its atmosphere and residential area."

Mrs. Catherine Rule, who resided at 4306 Plainfield Avenue, about 4 or 5 blocks from the subject property, testified that many of the children from Roberton Avenue are students at the parochial school on Bowleys Lane and walk to school. She

also testified in regard to a proposed playground in a triangular tract of land to the rear of the houses on Roberton and Chatford Avenues and located immediately to the southwest of the subject property.

There were introduced into evidence photographs of portions of the subject property and of Bowleys Lane at and near the subject property as well as photographs showing neighboring properties. Bowleys Lane at the subject property is rather narrow and there are no sidewalks erected on either side. It is to be widened by 15 feet and the plat showing the proposed filling station gives effect to this proposed widening and the building of a sidewalk on the west side of Bowleys Lane in front of the proposed filling station.

The appellants have attached as an appendix to their brief a letter dated May 28, 1965 from Joseph J. King, Executive Secretary of the Department of Recreation and Parks to the Assistant City Solicitor, which reads as follows:

"This is in reply to your inquiry concerning a city-owned playground lying to the rear of the houses at Chatford Avenue and Roberton Avenue. This property is owned by the Mayor and City Council of Baltimore, was donated to the City for playground purposes by the Welsh Construction Company in 1958, and has since been used for playground purposes. We intend to continue this use and, currently, we have plans to renovate the playground with new fencing and installation of equipment. The playground is well within 300 feet of the filling station site on Bowleys Lane which you referred to."

This was not offered into evidence either before the Board or before the lower court. The appellees have filed a motion to expunge this letter from the appendix to the appellant's brief and this motion will be granted. There is no evidence in the record which indicates that this triangular tract to the southwest of the subject property is a *public playground* within the meaning of the provision of Section 37(a) of the Zoning Ordinance which mandatorily provides that a filling station may not be erected within 300 feet measured in a straight line, to-

the nearest boundary line of any public park, public square or public playground. The 300 foot radius plat prepared by the Board to ascertain the existence of such public parks, squares or playgrounds does not indicate the existence of a public playground within 300 feet of the subject property and the decision of the Board does not find that such a public playground did so exist. The record does indicate, however, that children play on the triangular tract even though, as we have indicated, the record does not show that the tract is a *public* playground.

The primary question in the case is whether the Board in the exercise of its original delegated power by Sections 37, 38 and 39 of the Zoning Ordinance had a reasonable basis upon which to deny the application for the gasoline filling station.

٭ Section 37 provides that "in addition to the regulations and restrictions set forth in the preceding sections certain uses are further limited so that * * * a filling station and/or tanks and/or pumps for the sale at wholesale or retail of inflammable liquids in a use district where permitted by the use regulations * * * may be permitted, only after a public hearing before the Board * * *." There is a mandatory prohibition of the erection or use of a structure for the sale of gasoline, or other motor fuel within 300 feet of a public park, public square, or public playground or of a building used as a church, orphanage, school, theatre or motion picture theatre or within 600 feet of a public hospital. Section 38 provides for the reference of the application for the uses enumerated in Section 37 and supporting data to the Board of Fire Commissioners, the Commissioner of Health and the Traffic Commission (now the Department of Transit and Traffic) for investigation and report in regard to the fire, health and traffic hazards, respectively, involved.

Section 39 provides the guides and standards applicable in cases of original jurisdiction. It provides, *inter alia,* that "the Board shall inspect the premises and shall hold a public hearing, giving all parties in interest the right to testify as to any material fact in connection with the proposed use and shall act as a fact-finding body and shall approve or disapprove the issuance of the permit for the proposed use in accordance with the evidence adduced before it and from its own investigation as to whether or not such proposed use would menace the public health,

safety, security or morals, and as a further guide to their decision upon the facts of the case, they shall give consideration to the following:".

Then follow 12 separate guides and standards. Of these the following are of particular relevance to this case:

> "(5) Protection of occupants of buildings from noise, dust and gases caused by traffic.
>
> "(6) The type of electric illumination for the proposed use with special reference to its effect upon nearby structures and the glare, if any, from such illumination in surrounding sleeping quarters, if any.
>
> * * *
>
> "(8) The size, type and kind of structures in the vicinity where the public are apt to gather in numbers, such as theatres, churches, hospitals, schools and the like.
>
> "(9) The proximity of dwellings and the effect such uses have, if any, upon the peaceful enjoyment of such dwellings.
>
> * * *
>
> "(11) The conservation of property values.
>
> "(12) Any other matters considered to be in the interest of the general welfare."

In a case like the one at bar—involving the exercise by the Board of its original delegated authority—the scope of judicial review is most limited. The test is not whether the Board's decision is supported by substantial evidence or whether the Court upon the same facts would have reached the same conclusion as that reached by the Board. Judge Hammond, for the Court, reviewed our prior cases in *Adler v. Mayor and City Council of Baltimore,* 220 Md. 623, 155 A. 2d 504 (1959) and stated the test to be applied by the Court as follows:

> "* * * [T]his Court consistently has held that the test of the validity of the refusal to allow a filling station at a given site is not whether the action is supported by substantial evidence, and not whether the court agrees with the findings, or the result, but rather whether there was a reasonable basis to support the

refusal as an exercise of the police power. To state it conversely, the court will not upset the refusal unless the bounds of the police power have been exceeded and the applicant deprived of his property without due process of law. *Kramer v. Mayor and City Council*, 166 Md. 324; *Mayor and City Council v. Biermann*, 187 Md. 514; *Hoffman v. Mayor and City Council*, 187 Md. 593; *Maryland Advertising Co. v. Mayor and City Council*, 199 Md. 214; *Gilmor v. Mayor and City Council*, 205 Md. 557." (Pages 628-629 of 220 Md.; page 507 of 155 A. 2d).

In the case at bar three members of the Board voted to disapprove and two members voted to approve the application. Even where a majority of the Board votes for approval, but less than the required four votes, we held in *Mayor and City Council of Baltimore v. Biermann*, 187 Md. 514, 50 A. 2d 804 (1947), that although the Board was prevented from acting as a fact-finding body, this did not open the Board's action to unlimited judicial review. In *Biermann*, Judge Henderson, for the Court, stated:

"* * * [A]lthough the Board was precluded, by the adverse vote, from acting as a fact-finding body, this fact did not render its action a nullity, or open the question to unlimited review. The question before us is not whether there was substantial evidence before the Board to support a minority finding, but whether there was a reasonable basis in fact to support the refusal as an exercise of the police power. * * *

"Considering the action of the Board as an exercise of delegated legislative or quasi legislative, power, the scope of review is different and in some respects more limited than where the action is quasi judicial; *e.g.*, the court must find that the result of the action is beyond the police power and deprives the applicant of property without due process of law. On this question the property owner has the heavy burden of overcoming the presumption of constitutionality of legislative action, even if the legislative

body acted without evidence at all." (Pages 522-523 of 187 Md.; page 808 of 50 A. 2d).

The Court then indicated that because of the hazard to school children at the proposed location of the filling station and the large number of filling stations in the vicinity, there was no lack of a reasonable basis for a denial of the permit under the police power.

We have also held that the favorable reports of the Fire Commissioners, the Commissioner of Health and the Department of Transit and Traffic are not controlling. *Shell Oil Co. v. Baltimore*, 225 Md. 463, 472, 171 A. 2d 234, 238 (1961).

We have concluded that in the case at bar there was a reasonable basis to support the Board's refusal as an exercise of the police power and that its refusal was not arbitrary, unreasonable or capricious resulting in a denial to the applicants of due process of law.

There was evidence before the Board indicating that the erection of the proposed filling station would create a traffic hazard to the children who use Bowleys Lane to attend the church and parochial school approximately two blocks away from the subject property and to the children, who in fact, use the lot adjoining the subject property on the west as a lot on which they play. As there are 750 homes in the neighborhood occupied by young married people, who "have young children", the Board could reasonably conclude that the erection of the proposed filling station on the subject property would create an unwarranted traffic hazard affecting the safety of those children. This type of traffic hazard was one of the substantial factors which we held sufficient to justify the denial of a filling station permit in the *Biermann* case.

The Board also had before it the disapproval of the Planning Commission. This disapproval indicated that the Board, itself, in 1964 had recommended to the City Council of Baltimore City that it not approve proposed Ordinance No. 485 to rezone a portion of the subject property for the purpose of erecting a gasoline filling station because it would be an unwarranted commercial intrusion and that there had been no substantial neighborhood change since that time.

The applicants contend that the Board made no findings of

the facts on which it based its opinion. Although its findings are perhaps not as specific as they might have been, we are of the opinion that they are sufficient, assuming, *arguendo*, that the Board must specify the basis on which it predicates its denial of an application under Sections 37, 38 and 39 of the Zoning Ordinance. Its Resolution of February 17, 1965 stated in part:

"There was testimony presented by the protestants who appeared that they were in opposition to the gasoline service station and that the service station would create additional traffic hazards.

"The Board is in receipt of a letter from the Planning Commission indicating that this property was subject to pending Ordinance No. 485 (1964) proposing to re-zone the property from a Residential Use District to a First Commercial Use District for the purpose of erecting a gasoline service station. They indicate that since the purpose of the subject appeal to the Board for an extension of the commercial use is identical to the purpose of the earlier ordinance and no substantial change to the neighborhood has occurred, it is recommended that the application be denied.

"The Board finds that there is no justification for extending the commercial zone line into the residential area in this appeal.

"With due consideration to the guides and standards set forth in Section 39 of the Zoning Ordinance and to the reports of the several City departments as required by the Zoning Ordinance, the Board finds that the proposed filling station would menace the public health, safety, security and morals.

"In accordance with the above facts and findings, the Board disapproves the application."

The Resolution indicates to us that the Board accepted the testimony of the protestants of the danger from traffic to the children in the residential properties in the vicinity of the subject property who attend the church and parochial school some two blocks from the subject property and who play on the ad-

jacent play lot. It is apparent that the Board relied upon the recommended disapproval by the Planning Commission. The Board indicated also that it had considered the guides and standards set forth in Section 39 as well as the reports of the City departments required by Section 38 and found generally the proposed filling station would menace the public health and safety, security and morals. The traffic hazard and the recommended disapproval by the Planning Commission supplied a reasonable basis for the denial of the application by the Board.

The applicants contend that the commercial development of the First Commercial portion of the subject property for first commercial purposes would leave the northern portion in a residential use district "in a state of limbo" and that "it could never be used." In our opinion, the evidence in the case at bar is not sufficient to establish that even the northern portion of the subject property in the residential use district "could not be used for any reasonable purpose," which is the test as set forth in *City of Baltimore v. Borinsky*, 239 Md. 611, 622, 212 A. 2d 508, 514 (1965) and prior cases cited therein. The general statements relied on by the appellees are not sufficient to prove an unconstitutional taking. *Borinsky, supra.*

The appellees in the lower court introduced into evidence proposed Ordinance of the City No. 605 which had been introduced in the City Council at the request of the Shell Oil Company and which would have rezoned certain property at the corner of Bowleys Lane and Gunther Avenue, some 60 feet from the subject property, from a Residential Use to a First Commercial Use District and a letter of January 20, 1965 from the Board to the City Council recommending the passage of the proposed Ordinance. There are, however, no facts in the record to indicate the reasons for the Board's recommendation of January 20, 1965 and, assuming, without deciding, that the proposed ordinance and the Board's letter should be considered by us as they were not offered in evidence at the hearing before the Board, we are of the opinion that this action by the Board is not shown to be necessarily inconsistent with its action in the case at bar.

In our opinion the findings and conclusions of the Board which supplied a reasonable basis for the denial of the application

under Sections 37, 38 and 39 of the Zoning Ordinance, also justified the Board's denial of the application for a special exception under Section 14 of the Zoning Ordinance to extend a commercial use into a Residential Use District for a distance of 100 feet and for a variance to permit the proposed front yard violations. See *Marino v. Mayor and City Council of Baltimore*, 215 Md. 206, 137 A. 2d 198 (1957) and *Carney v. City of Baltimore*, 201 Md. 130, 93 A. 2d 74 (1952).

*Appellees' motion to expunge the letter of May 28, 1965 granted; order of the lower court reversed; case remanded for the passage of an order affirming the action of the Board; the appellees to pay the costs.*