# AMERICAN OIL COMPANY v. BOARD OF APPEALS OF MONTGOMERY COUNTY ET. AL.

[No. 51, September Term, 1973.]

*Decided November 9, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*C. Edward Nicholson* for appellant.

*William J. Chen, Jr., Assistant County Attorney*, with whom were *Richard S. McKernon, County Attorney*, and *Alfred H. Carter, Deputy County Attorney*, on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

In this zoning case the principal issue is whether the action of the appellee, Board of Appeals of Montgomery County (the Board), in denying, on October 10, 1972, to the appellant, American Oil Company (Amoco), a special exception to construct and operate an automobile filling station on land at the northwest corner of the intersection of Middlebrook Road and Maryland Route 355 in Montgomery County was fairly debatable or was arbitrary, unreasonable, and capricious. The Circuit Court for Montgomery County (Fairbanks, J.) on appeal passed an order on April 2, 1973, affirming the Board and a timely appeal from that order was taken to this Court.

The subject property is somewhat rectangular in shape and, as indicated, is in the northwest quadrant of the intersection of Middlebrook Road and Maryland Route 355 in Montgomery County (the County). It is undeveloped and has several large trees. It is zoned C-2, Commercial.

Amoco indicated in its petition for a special exception for the proposed filling station that the requested use would be to replace an automobile filling station which it had operated at the southeast quadrant of the same intersection. This obsolete filling station has been torn down. At the public hearing before the Board, Amoco produced only three witnesses, *i.e.*, (1) a land engineer and planner, A. Morton Thomas; (2) a construction engineer, Karl M. Hirsch; and (3) a real estate representative, Henry Cerasoli. No witnesses appeared in opposition to the granting of the petition.

Mr. Thomas, the land engineer and planner, in his testimony before the Board, did not refer to any study or report he had prepared. On the contrary, he used the Report

of the Technical Staff of the Maryland-National Capital Park and Planning Commission (the Commission), the street layout of the Germantown area prepared by the Commission's staff, and the zoning and highway plan map of the Master Plan for Germantown, but not the text of that Master Plan. After using these documents to indicate to the Board the geographic area of the requested filling station, Mr. Thomas stated that the site "is on rural ground that has been mainly farmed. It right now is in pasture." He also observed that the "intersection of Middlebrook Road and Maryland Route 355 has been and still is . . . somewhat of a rural county road intersection [with] just a few residences and just a few small stores around it." He then stated: "[T]his complex is *anticipated to change greatly* which is referred to in the staff report *when the Germantown master plan is implemented* with all of its proposed development." (Emphasis supplied.) He thought that this intersection *"will serve* as the hub or the center of neighborhood areas 7, 8, 9, and 10." (Emphasis supplied.) He was also of the opinion that neighborhood areas 8, 9 and 10 in which "it is planned on the Germantown master plan that a large commercial area be developed in the vicinity of the intersection of Middlebrook Road and 355, at which the gasoline service station was approved, it would be a part of the overall service area." Mr. Thomas concluded that in his "thinking and observation, this area is certainly an ideal location for a gasoline service station not only to serve the existing developments that are being generated in this area, but also for the overall 800-acre tract which *will be intensely developed* as *proposed* by the Germantown master plan." (Emphasis supplied.)

When a member of the Board inquired in regard to the availability of sewers, Mr. Thomas stated that there was no current service and that, "right at the present time," everything was "sort of in limbo" at the Washington Suburban Sanitary Commission (WSSC). Mr. Thomas suggested that, on a temporary basis, a septic tank could be used.

At this point, Amoco, through its counsel, requested that

the Board grant a grace period of two and one-half years to implement the special exception, if granted, because of the lack of sewer facilities.

Even though Mr. Thomas was not a traffic engineer or expert, he testified that at the time of the hearing, Maryland Route 355 had two 12-foot lanes with a total width of 24 feet of macadam surface. On the Germantown Master Plan, Route 355 is classified as a major highway with a proposed 102-foot right of way with a recommended pavement width of four to six lanes. The State Highway Administration, however, has not made any provisions for the proposed improvement to Route 355 in its five-year program, FY 1972-76, and thus the road is not on the State's program for upgrading at the present time. Mr. Thomas further testified that in front of the site of the subject property, the average daily traffic totalled 900 vehicles for a 24-hour count in both directions. He said that with the proposed improvement to six lanes, Route 355 would have a design capacity of between 32,000 and 37,000 vehicles in both directions for a 24-hour period. Middlebrook Road is not a state road, Mr. Thomas stated, but is a county road having a total width of 20 feet of macadam surface. The current capital improvement program for the County (FY 1972-77) contains no provision for the improvement of Middlebrook Road. Mr. Thomas also observed that the Germantown Master Plan proposes that this road be classified as a major highway, but relocates it to the north of the site of the subject property. This relocation would either eliminate the section of Middlebrook Road located at the site or lead to its use as a service road or its being cut off to the west of the site in a cul-de-sac. Amoco made no traffic count for this road and the County has never made a traffic count on that road since the County considered it to be only a minor road presenting "no problems at all." Mr. Thomas stated that, upon the relocation of Middlebrook Road, the requested filling station would be oriented toward and dependent upon Route 355, but that, in his opinion, the relocation of Middlebrook Road would not affect the usefulness of the proposed filling station or its consistency with the Germantown Master Plan.

Through Mr. Thomas, Amoco introduced an exhibit, mentioned above, of a street layout within a limited area surrounding the subject property, showing that there were eight existing gasoline filling stations within 3.4 miles of the subject property, two of which were outlets of the American Oil Company. One of the Amoco stations is located at the northwest intersection of Germantown Road (Maryland Route 118) and Aircraft Drive some 2.5 miles from the subject property; the other is located on the west side of Maryland Route 355 in Wilson Heights some 2.7 miles from the subject property. The remaining six filling stations are: an Exxon station 0.6 miles away on the east side of Route 355 south of the subject property; a Texaco station 1.0 miles to the north on the west side of Route 355; a Gulf station 2.6 miles to the west on the east side of Germantown Road northeast of Middlebrook Road's intersection with Germantown Road; a Gulf station 2.8 miles to the south on the west side of Route 355 in Wilson Heights near the Amoco station, which is also located on the west side of Route 355; a Shell station 3.1 miles to the south on Orchard Road near the right of way of the Baltimore and Ohio Railroad; and a Texaco station to the south near the southwest corner of the intersection of Orchard Road and Clopper Road.

Amoco next called Mr. Hirsch, one of its construction engineers, who was responsible for the site plan of the requested gasoline station. He described the proposed building which appeared on an exhibit of the site plan, the bays, the parking spaces, lights and other proposed improvements. He stated that the site plan complied with all of the technical requirements of the ordinance applicable to gasoline filling stations, including the type of required screening. No automobile rental facilities were contemplated on the subject property.

Amoco's third and last witness was Mr. Cerasoli, Amoco's real estate representative. Part of his testimony focused on the operation of the former Amoco filling station located on the southeast quadrant of the intersection of Route 355 and Middlebrook Road. A photograph of the former Amoco station was admitted into evidence showing an obsolete type

of station. Its gallonage was only 240,000 gallons a year which, the witness stated, "is not very conducive to good business" from that type of facility. Amoco projected that, if the Board granted the special exception, in its first year of operation, the new station would have a gallonage of 480,000 gallons. He estimated that the two gasoline filling stations nearest the subject property were each "doing" approximately 360,000 gallons a year. The Texaco station had been recently refurbished.

It will be noted that Amoco produced no evidence from residents living in the vicinity of the subject property that another filling station was needed. It produced no studies or reports prepared by it, apparently preferring to rely upon the Germantown Master Plan (without the text being offered in evidence, however) and the Report of the Technical Staff of the Commission. Nor was any evidence produced of a "need deficiency."

The Board, on October 10, 1972, denied Amoco's petition, by a vote of three to two. In its opinion the Board stated in part:

> "After careful consideration of the proposed automobile filling station and the evidence concerning the need for a filling station at the proposed location, the Board finds that the subject petition is premature and that the petitioner has not been persuasive by a preponderance of the evidence of record that for the public convenience and service a need exists for the proposed automobile filling station for service to the present population in the general neighborhood considering the present availability of such uses to that neighborhood."

Amoco appealed the Board's order denying its petition to the Circuit Court for Montgomery County. After a hearing, Judge Fairbanks filed a written opinion on April 2, 1973, indicating that the Board's action was not arbitrary or capricious, but was fairly debatable. He, therefore, passed

an order affirming the Board's action. From this order of April 2, 1973, Amoco perfected a timely appeal to this Court.

The applicable statutory provisions giving the Board power to grant a special exception for an automobile filling station are presently codified as Sections 59-123, 59-124 and 59-131 of the Montgomery County Code, 1972, as amended. Section 59-123 contains general requirements and standards which must be met by all requests for special exceptions. It provides:

"Sec. 59-123. Prerequisites to granting.

"(a) A special exception may be granted when the Board, or the Director, as the case may be, finds from a preponderance of the evidence of record that the proposed use:

"(1) Will be consistent with the general plan for the physical development of the district including any master plan or portion thereof adopted by the Commission;

"(2) Will be in harmony with the general character of the neighborhood considering population density, design, scale and bulk of any proposed new structures, intensity and character of activity, traffic and parking conditions, and number of similar uses;

"(3) Will not be detrimental to the use, peaceful enjoyment, economic value, or development of surrounding properties or the general neighborhood; and will cause no objectionable noise, vibrations, fumes, odors, dust, glare or physical activity;

"(4) Will have no detrimental effect on vehicular or pedestrian traffic;

"(5) Will not adversely affect the health, safety, security, morals, or general welfare of residents, visitors, or workers in the area;

"(6) Will not, in conjunction with existing development in the area and development

permitted under existing zoning, overburden existing public services and facilities, including schools, police and fire protection, water, sanitary sewer, public roads, storm drainage, and other public improvements; and

"(7) Meets the definition and specific standards set forth elsewhere in this ordinance for such particular use.

"(b) The applicant for a special exception shall have the burden of proof which shall include the burden of going forward with the evidence and the burden of persuasion on all questions of fact which are to be determined by the Board or the Director."

Additional terms and conditions are contained in Section 59-124, which provides in pertinent part:

"Sec. 59-124. Additional terms and conditions.

"(a) The Board, or the Director, when appropriate, is hereby empowered to add to the specific provisions enumerated herein others that it may deem necessary to protect adjacent properties, the general neighborhood, and the residents, workers and visitors therein."

* * *

"(f) In addition to the findings required in sections 59-123 and 59-125 through 59-184, the following special exceptions may be granted when the board or director, as the case may be, *finds from a preponderance of the evidence of record that for the public convenience and service a need exists for the proposed use for service to the population in the general neighborhood considering the present availability of such uses to that neighborhood:*

"(1) *Automobile filling stations.*"
(Emphasis supplied.)

Section 59-131 contains special provisions in regard to automobile filling stations and, in relevant part, provides:

"Sec. 59-131. Automobile filling stations.

"(a) In a C-1, C-2, I-1, or I-2 zone, an automobile filling station may be permitted, upon a finding, in addition to findings required in sections 59-123 and 59-124, that:

"(1) The use will not constitute a nuisance because of noise, fumes, odors or physical activity in the location proposed.

"(2) The use at the proposed location will not create a traffic hazard or traffic nuisance because of its location in relation to similar uses, necessity or turning movements in relation to its access to public roads or intersections or its location in relation to other buildings or proposed buildings on or near the site and the traffic pattern from such buildings, or by reason of its location near a vehicular or pedestrian entrance or crossing to a public or private school, park, playground or hospital, or other public use or place of public assembly.

"(3) The use at the proposed location will not adversely affect nor retard the logical development of the general neighborhood or of the industrial or commercial zone in which the station is proposed, considering service required, population, character, density and number of similar uses.

"(b) In addition, the following requirements shall be complied with:"

\* \* \*

"(4) When such use occupies a corner lot, the ingress or egress driveways shall be located at least twenty feet from the intersection of the front and side street lines of the lot as defined in section 59-1, and such driveways shall not exceed thirty feet in width; provided, that in

areas where no master plan of highways has been adopted, the street line shall be considered to be at least forty feet from the center line of any abutting street or highway."

As we have decided many times, the courts will not substitute their judgment for that of the administrative authority acting within its powers if the issue involved is fairly debatable and the action of the administrative authority is thus not arbitrary and capricious resulting in a denial of due process of law as prohibited by Art. 23 of the Declaration of Rights of the Maryland Constitution. As we recently stated in *Shapiro v. Montgomery County Council*, 269 Md. 380, 388-89, 306 A. 2d 253, 257 (1973), quoting with approval from *Eger v. Stone:*

"As we stated in *Eger v. Stone*, 253 Md. 533, 542, 253 A. 2d 372, 377 (1969):

'We have made it quite clear that if the issue before the administrative body is "fairly debatable" . . . the courts will not substitute their judgment for that of the administrative body . . . .'

'This rule will be adhered to even if we were of the opinion that the administrative body came to a conclusion we probably would not have reached on the evidence.' "

In *Adler v. Mayor & City Council of Baltimore*, 220 Md. 623, 628-29, 155 A. 2d 504, 507 (1959), we articulated this same basic doctrine as particularly related to the refusal of a special exception by the Board of Municipal and Zoning Appeals of Baltimore City even though the City Fire Department, the Health Department and the Department of Traffic and Transit all approved the application. We there stated the following:

"Whether the approval needed [for the granting of the special exception for an automobile filling station] was that of the Council or the Board, this

Court consistently has held that the test of the validity of the refusal to allow a filling station at a given site is not whether the action is supported by substantial evidence, and not whether the court agrees with the findings, or the result, but rather whether there was a reasonable basis to support the refusal as an exercise of the police power. To state it conversely, the court will not upset the refusal unless the bounds of the police power have been exceeded and the applicant deprived of his property without due process of law. *Kramer v. Mayor and City Council,* 166 Md. 324; *Mayor and City Council v. Biermann,* 187 Md. 514; *Hoffman v. Mayor and City Council,* 187 Md. 593; *Maryland Advertising Co. v. Mayor and City Council,* 199 Md. 214; *Gilmor v. Mayor and City Council,* 205 Md. 557."

*See Crown Central Petroleum Corp. v. Mayor & City Council of Baltimore,* 258 Md. 82, 265 A. 2d 192 (1970) and *Mayor & City Council of Baltimore v. Muller,* 242 Md. 269, 277-78, 219 A. 2d 91, 96-97 (1966), following *Adler* and quoting from the *Adler* opinion.

In our opinion, there was a reasonable basis for the Board's denial of the Amoco petition for the special exception and the opinion of the Board sufficiently identified that basis. *See Dundalk Holding Co. v. Horn,* 266 Md. 280, 292 A. 2d 77 (1972).

The Board in its written opinion — the relevant portion of which we have already set out in full — found, in considering the need for the proposed filling station on the subject property, as it was required to do by Sec. 59-124 (f), that the Amoco petition was premature and that Amoco "has not been persuasive by a preponderance of the evidence of record that for the public convenience and service *a need exists* for the proposed automobile filling station for service to the *present population* in the general neighborhood considering the present availability of such uses to that neighborhood." (Emphasis supplied.)

Amoco argues that "prematurity" is not one of its proper

criteria and that the Board thus used an *ultra vires* standard in reaching its decision. We are of the opinion, however, that a fair reading of the Board's statement as a whole indicates that the "prematurity" mentioned in that opinion is related to the failure of proof of *present need* for the proposed filling station in light of the *present* availability of filling station facilities to the population in the general neighborhood of the subject property. Thus, in effect, no new or impermissible criterion was used by the Board in reaching its decision.

We have held in a number of cases that a Board may consider as important the presence of other filling stations in the general area in reaching its decision in regard to granting or refusing an application for another filling station. In *Prince George's County v. Lightman*, 251 Md. 86, 91-92, 246 A. 2d 261, 264 (1968), we stated:

> "As in *Luria* [*County Commissioners v. Luria*, 249 Md. 1, 238 A. 2d 108 (1968)], there was uncontradicted testimony to show a substantial number of filling stations in the area (11 filling stations within 3/4 of a mile in *Luria*; 7 filling stations within 2500 feet in the present case) and it cannot be said that the Board with this fact in the record *must find* that the applicants met the burden of proof. Indeed, in *Mayor & City Council of Baltimore v. Biermann*, 187 Md. 514, 523, 50 A. 2d 804, 808-809 (1947) we indicated that the number of filling stations in the vicinity was one of the factors to be considered in sustaining a denial of a special exception for a filling station . . . ."

And see the prior opinions of this Court cited in *Lightman* and in *Luria*, both *supra*.

As we have indicated, there are eight other filling stations within 3.4 miles of the subject property, two of which are Amoco stations.

Then, too, in considering the question of need, the evidence indicated that the old Amoco station, removed by

Amoco from the southeast quadrant of the intersection of Route 355 and Middlebrook Road, did a business of only 240,000 gallons of gasoline a year, which Amoco's own witness and employee characterized as "not very conducive to good business." Since the two closest stations — one refurbished — were each selling about 360,000 gallons a year, the Board might reasonably conclude that there would likely be insufficient public patronage to support another filling station in the area of this "rural county road intersection," as one of Amoco's witnesses described the intersection of Route 355 and Middlebrook Road.

The Board could reasonably consider that, if Middlebrook Road is relocated, the proposed filling station would be oriented to and wholly dependent upon Route 355 for its gasoline business.

Nor does the Report of the Commission's Technical Staff assist Amoco. It reads in relevant part:

> "In summary, the Staff is of the opinion that *future development in the area,* if it proceeds in accordance with the current proposals of the Master Plan for the area, will be of such a nature and degree *so as to create the need for an additional service station.* The Staff does, however, urge that in the public interest the final decision on this matter by the Board of Appeals should await the recommendations of the consultant concerning the review and restudy of the Germantown Planning Area."
>
> (Emphasis supplied.)

When the Review of the Germantown Master Plan was received (and considered by the Board), it stated in regard to the Route 355 — Middlebrook Road intersection:

> *"The 1967 Master Plan proposed commercial uses on all four corners of Route 355 and Middlebrook Road. This type of development is not only incongruous with the village plan, but with the heavy automobile orientation, dilutes the*

*possibility of any pedestrian circulation.* This study recommends that the development rights in these commercial areas be transferred to equivalent residential densities in attempt to approach an equitable economic exchange for existing commercial property owners. The study also recommends that none of the existing commercial activity on Route 355 and Middlebrook Road be permitted to expand beyond the present zoned acreage."
(Emphasis supplied.)

In regard to the development of transit systems, the Review stated:

"An internal transit system will focus on the Town Center, linking it with the village centers. Initially it will be a simple shuttle operation. When all villages are complete, the buses will operate in two directions in a figure 8 pattern, with Town Center at the cross of the 8. The purpose of this system will be to increase opportunities for people without automobiles, *to reduce the need for two cars in a family,* and to eliminate the mother-child chauffeuring problem."
(Emphasis supplied.)

The Review also stated:

"Development of the Town Center should not be preempted by small scale automobile oriented 'strip-type' development."

It is thus seen that the Review indicates that the planning of the Germantown area with express reference to the Route 355 — Middlebrook Road intersection is *away from* automobile transit systems and seeks *to reduce* support services needed for such systems. Indeed, it militates against the establishment of another filling station at that intersection.

We have already indicated that Amoco offers no studies or reports prepared by it, showing perhaps the number of residents in the general trading area, the average number of automobiles per household and the average number of gallons of gasoline consumed per vehicle in Maryland, in order to indicate a need for an additional gasoline filling station on the subject property. Nor were surveys of the general market area supplied the Board, such surveys possibly indicating that residents in the area had expressed their views that another filling station was needed for their use and convenience. In view of the evidence produced before the Board, as well as the lack of possible evidence in regard to the need for another filling station on the subject property, we are of the opinion that the Board could reasonably conclude that Amoco did not establish by a preponderance of the evidence that "a need exists for the proposed use for service to the population in the general neighborhood considering the present availability of such uses to that neighborhood" as required by Section 59-124 (f). Hence, the issue was fairly debatable and the Board's action was not arbitrary and capricious as Judge Fairbanks properly held.

*Order of April 2, 1973, affirmed,*
*the appellant to pay the costs.*