700 A.2d 117

**BRANDYWINE ENTERPRISES, INC.**

v.

**COUNTY COUNCIL FOR PRINCE GEORGE'S COUNTY,**
Maryland, Sitting as the District Council, et al.

**No. 1510, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Oct. 6, 1997.

526

Lawrence N. Taub, Largo, for appellant.

J. Carroll Holzer, Towson, Joyce B. Nichols, Upper Marlboro, for appellees.

Argued before SALMON, EYLER and SONNER, JJ.

EYLER, Judge.

The issue presented by this appeal is whether the denial of a special exception by the County Council for Prince George's County sitting as the District Council (District Council), appellee, was arbitrary, capricious, and illegal. Brandywine Enterprises, Inc., appellant, is the applicant, and Mattaponi Basin Citizens Association, Clark Aist, Mary Murphy, Joel Proctor, and Dorothy Proctor, appellees, are opponents.

## Facts

Appellant is the owner of approximately 450 acres of land zoned O–S, located on the south side of Cross Road Trail approximately one mile east of its intersection with Md. Route 301. Approximately 177 acres currently are utilized as a rubble fill approved by the District Council as a special exception on November 24, 1988, and valid through November 24, 1999. That special exception in turn constituted an extension and continuation of a special exception for the operation of a rubble fill previously granted. Although the record contains some discrepancy regarding the date a special exception first was issued for the operation of a rubble fill on any portion of the 450 acre tract, it appears that appellant has

been operating a rubble fill on the tract since at least 1982.[1] At the time of the administrative hearings below, most of the 450 acre tract had been used for sand and gravel mining. In addition, the 177 acre rubble fill included a closed section[2] and an active and operating section.

On April 2, 1993, appellant filed an application for a special exception for extension of its rubble fill operation onto 274 acres, immediately adjacent to the existing rubble fill, and intended to begin operating after the fill of the existing rubble fill is completed. After analysis of the Application, the technical staff of the Maryland–National Capital Park & Planning Commission (M–NCPPC) issued its technical staff report on July 26, 1993. The technical staff recommended denial on the basis that appellant had failed to meet its burden of proof with regard to various issues, and expressed particular concern with respect to the impact on neighboring residential properties "surrounded" by the proposed rubble fill. Subsequently, appellant amended its application (Application) to reduce the acreage from 274 acres to 118 acres (Subject Property). According to appellant, the reduction of acreage was in response to the technical staff's concern about the impact of the rubble fill on the neighboring residential properties. A new technical staff report was issued on January 5, 1994, recommending approval subject to certain conditions. One of the conditions was that "[t]his use shall not commence until [the existing rubble fill approved as a special exception on Nov. 24, 1988] has been completed and closed out in accordance with all applicable State and County laws." On February 24, 1994, the

---

1. Two technical staff reports located in the record extract indicate that the first special exception for operation of a rubble fill was granted in 1977 and extended in 1982 until 1988. However, Brent Diltz, Chief Operating Officer for appellant, testified that the rubble fill operation did not begin until 1982 or 1983, and that the earlier special exception was for operation of a sand and gravel mine.

2. Testimony indicated that the "closed" portion of the fill had not yet been fully capped and closed in accordance with State and County requirements. Further, testimony indicated that odors continued to emanate from the closed portion.

Prince George's County Planning Board of the M–NCPPC adopted the technical staff's recommendation of approval, subject to the recommended conditions.

On March 3, 4, and 23, 1994, the zoning hearing examiner held hearings on the Application. On April 1, 1994, the hearing examiner issued his decision denying the Application based upon an inadequate showing of "need" based on projected growth in the County as required by § 27–406(g) & (h) of the zoning ordinance, plus the unique impact of odor, noise, dust, and views on adjacent residential properties. Appellant filed exceptions to the hearing examiner's decision on April 21, 1994. The District Council, on May 24, 1994, remanded the Application to the hearing examiner to take additional evidence limited to "(a) the finding required by § 27–406(g) & (h), [of the zoning ordinance], including a study and an analysis of the study by the Technical Staff, (b) the necessity of mounding, and (c) the impact of mounding on the stormwater management system in this area."

In response, the Natural Resources Division of M–NCPPC prepared a Rubble Fill Needs and Mounding Impact Study, which was transmitted to the hearing examiner on January 9, 1995. On January 11, February 3, and February 15, 1995, the hearing examiner held hearings to take evidence in accordance with the purpose of remand. The hearing examiner filed his decision on April 11, 1995, stating that the evidence could support a finding of need, but denying the Application because of the unique adverse impact on the adjacent properties. Appellant filed exceptions to this decision on May 10, 1995.

On October 10, 1995, following oral argument on October 2, the District Council issued an order denying the Application. Appellant subsequently appealed to the Circuit Court for Prince George's County, which, after argument, by written order dated July 26, 1996, affirmed the District Council's order of denial. This appeal followed.

### Standard of Review

██ The standards for judicial review of the grant or denial of a special exception use were most thoroughly set

forth by the Court of Appeals in the modern seminal case of *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981). As noted in that case,

> [t]he special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception use is a valid zoning mechanism that delegates to an administrative board limited authority to allow enumerated uses which the legislature has determined to be permissible *absent any fact or circumstance negating the presumption.* The duties given the Board are to judge whether the *neighboring properties in the general neighborhood would be adversely affected* and whether the use in the particular case is in harmony with the general purpose and intent of the plan.
>
> Whereas, the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements, he does not have the burden of establishing affirmatively that his proposed use would be a benefit to the community. If he shows to the satisfaction of the Board that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public interest, he has met his burden. The extent of any harm or disturbance to the neighboring area and uses is, of course, material. If the evidence makes the question of harm or disturbance or the question of disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the Board to decide. But if there is no probative evidence of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the operation of the comprehensive plan, a denial of an application for a special exception use is arbitrary, capricious, and illegal.

*Id.* at 11, 432 A.2d 1319 (emphasis in original). The Court more particularly held that

> the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are

facts and circumstances that show that the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone. *Id.* at 22–23, 432 A.2d 1319. Stated somewhat differently, "where the facts and circumstances indicate that the particular special exception use and location proposed would cause an adverse effect upon adjoining and surrounding properties unique and different, in kind or degree, than that inherently associated with such a use regardless of its location within the zone, the application should be denied." *Board of County Comm'rs v. Holbrook*, 314 Md. 210, 217–18, 550 A.2d 664 (1988). *See also Mossburg v. Montgomery County*, 107 Md. App. 1, 8–9, 666 A.2d 1253 (1995), *cert. denied sub nom., Twin Lakes Citizens v. Mossburg*, 341 Md. 649, 672 A.2d 623 (1996). "Furthermore, if the evidence makes the issue of harm fairly debatable, the matter is one for the Board's decision, and should not be second-guessed by an appellate court." *Id.* at 218, 550 A.2d 664.

## Discussion

Appellant filed its Application for a special exception pursuant to § 27–406 of the Zoning Ordinance of Prince George's County (1995). That section provides in part as follows:

(a) A sanitary landfill or rubble fill may be permitted as a temporary Special Exception.

(b) The District Council shall determine the period of time for which the Special Exception is valid.

. . . .

(e) The Technical Staff Report prepared in response to the application shall include a current, Countywide inventory of the locations, dates of approval, and conditions of approval concerning haul routes and estimated loads per day for all approved and pending Special Exceptions for sand and gravel wet-processing, sanitary landfills and rubble fills, and surface mining, as indicated by the record in the case. The inventory shall also include the locations of

all nonconforming sand and gravel wet-processing, sanitary landfills and rubble fills, and surface mining operations throughout the County that were certified after September 6, 1974.

(f) In reviewing the application for compliance with the required findings set forth in Sections 27–317(a)(4) and 27–317(a)(5), the District Council shall consider the inventory required in Section 27–406(e).

(g) The Technical Staff Report prepared in response to an application for a rubble fill shall include an analysis of need based on the most current available projections of residential and employment growth in Prince George's County over a fifteen-year period. The District Council shall consider this analysis when determining compliance with the finding required in Subsection (h), below, and when determining the period of time for which the Special Exceptions is valid.

(h) When approving a Special Exception for a rubble fill, the District Council shall find that the proposed use is necessary to serve the projected growth in Prince George's County.

Section 27–317 of the same Ordinance sets forth the findings that must be made by the District Council in order to approve an application for a special exception. That section provides as follows:

(a) A Special Exception may be approved if:

(1) The proposed use and site plan are in harmony with the purpose of this Subtitle;

(2) The proposed use is in conformance with all the applicable requirements and regulations of this Subtitle;

(3) The proposed use will not substantially impair the integrity of any validly approved Master Plan or Functional Master Plan, or, in the absence of a Master Plan or Functional Master Plan, the General Plan;

(4) The proposed use will not adversely affect the health, safety, or welfare of residents or workers in the area;

(5) The proposed use will not be detrimental to the use or development of adjacent properties or the general neighborhood; and

(6) The proposed site plan is in conformance with an approved Tree Conservation Plan.

One of the required findings pursuant to § 27–317 is that the proposed use and site plan be in harmony with the purpose of the Zoning Ordinance. § 27–317(a)(1). The purpose of the Zoning Ordinance is set forth in § 27–102(a), which provides as follows:

(a) The purposes of the Zoning Ordinance are:

(1) To protect and promote the health, safety, morals, comfort, convenience, and welfare of the present and future inhabitants of the County;

(2) To implement the General Plan, Area Master Plans, and Functional Master Plans;

(3) To promote the conservation, creation, and expansion of communities that will be developed with adequate public facilities and services;

(4) To guide the orderly growth and development of the County, while recognizing the needs of agriculture, housing, industry, and business;

(5) To provide adequate light, air, and privacy;

(6) To promote the most beneficial relationship between the uses of land and buildings and protect landowners from adverse impacts of adjoining development;

(7) To protect the County from fire, flood, panic, and other dangers;

(8) To provide sound, sanitary housing in a suitable and health living environment within the economic reach of all County residents;

(9) To encourage economic development activities that provide desirable employment and a broad, protected tax base;

(10) To prevent the overcrowding of land;

(11) To lessen the danger and congestion of traffic on the streets, and to insure the continued usefulness of all elements of the transportation system for their planned functions;

(12) To insure the social and economic stability of all parts of the County;

(13) To protect against undue noise, and air and water pollution, and to encourage the preservation of stream valleys, steep slopes, lands of natural beauty, dense forests, scenic vistas, and other similar features;

(14) To provide open space to protect scenic beauty and natural features of the County, as well as to provide recreational space; and

(15) To protect and conserve the agricultural industry and natural resources.

█ The District Council must find that the special exception would comply with the above provisions contained in the Prince George's County Code. Such provisions, however are "subject to the limitation that the adverse effects must be greater than or above and beyond the effects normally inherent with such a use anywhere within the relevant zones in the regional district," or, in this case, within the O–S zones of Prince George's County. *Mossburg*, 107 Md.App. at 21, 666 A.2d 1253.

The District Council denied appellant's Application based upon its review of the entire record and for reasons stated in the findings and conclusions of law of the zoning hearing examiner. In addition, the District Council enumerated a number of additional findings and conclusions, most of which appellant challenges. Of particular significance are the District Council's reliance upon *Moseman v. County Council*, 99 Md.App. 258, 636 A.2d 499, *cert. denied*, 335 Md. 229, 643 A.2d 383 (1994), and the District Council's findings with respect to the analysis of need.

In *Moseman*, we upheld the denial of a special exception for the operation of a rubble fill within an O–S zone in Prince George's County. Similar to the Subject Property in this

case, the property in *Moseman* was in proximity to "scenic" property,[3] historic sites,[4] a rubble fill, a surface mining operation, and single family homes utilizing well and septic systems. The appellants in that case had attempted to argue that the types of adverse effects presented by the proposed rubble fill were only such adverse effects as normally are associated with rubble fills and would have no different an impact in the proposed location than if the fill were located elsewhere within the O–S zone. In support of this argument, the appellants in *Moseman* pointed to the prior approval of another rubble fill within the area. We disagreed and held that the existence of another rubble fill was the very circumstance that made the site unique:

> The District Council recognized the unique problem the cumulative impact of two adjacent rubble fills would have on a single community by concluding that "given the existence of the adjoining rubble fill currently in operation, granting the proposed rubble fill would adversely impact the surrounding properties in a manner unique and different from the adverse impact which would otherwise result if a rubble fill were located elsewhere within the O–S Zone."

*Id.* at 266, 636 A.2d 499.

With regard to *Moseman*, the District Council stated as follows:

> The District Council finds that the Court of Special Appeals' decision in *Moseman* is factually similar to the instant application and therefore is dispositive of the uniqueness issue.

The District Council did not stop at that point, however, but went on to state the following:

---

**3.** The County Scenic Roads Study of 1984 was utilized in *Moseman* and in the case below.

**4.** With the possible exception of a family grave site that was located on the property currently being utilized as a rubble fill, but which was disinterred by appellant with the approval of the State's Attorney's Office, the record does not reveal the existence of any historic sites within the vicinity of the Subject Property.

The District Council concludes that the operation of S.E. 3849 and the subject application, both for rubble fills on Cross Road Trail, render the harm created by the subject application to be unique to this neighborhood and to the State of Maryland and different from the adverse impact which would otherwise result if a rubblefill (sic) were located elsewhere within the O–S Zone.

■ Appellees agree with the District Council's findings and argue in particular that *Moseman* is squarely on point because the condition, that the proposed rubble fill not commence operations until the final closing and capping of the active rubble fill, is unlawful and constitutes contract zoning. Alternatively, appellees argue that even the closed fill will adversely impact the surrounding area so that cumulative adverse effects still exist. Appellant argues that *Moseman* is not on point because it involved two active rubble fills rather than an active and a closed fill and that the condition postponing operations of the proposed fill is a lawful condition to which it has agreed. Further, appellant argues that the District Council's findings of cumulative adverse effects is based on generalized fears and unsubstantiated allegations rather than probative evidence.

Preliminarily, we agree with appellant that *Moseman* is not necessarily on all fours with the instant case. Thus, we would be troubled by the District Council's use of the term "dispositive" if the District Council had stopped at that point, but it did not.

■ We disagree with appellees' assessment that the condition constitutes unlawful contract zoning. Illegal contract zoning occurs when

a local government enters into an agreement with a developer whereby the government exacts a performance or promise from the developer in exchange for its agreement to rezone the property....

*People's Counsel v. Beachwood I Limited Partnership,* 107 Md.App. 627, 669, 670 A.2d 484 (1995), *cert. denied,* 342 Md. 472, 677 A.2d 565 (1996) (quoting Arden H. Rathkopf and

Daren A. Rathkopf, 3 *The Law of Zoning and Planning,*
§ 29A.03[b] at 29A–25). The prohibition against contract
zoning is a prohibition against a local government bargaining
away its future use of its police powers. *Id.*

■ This case does not involve an agreement to rezone any
property; instead, it merely involves the placement of condi-
tions upon a special exception use. The granting of a special
exception use subject to certain conditions is an appropriate
exercise of, rather than an abdication of, a local government's
police powers. *See Mossburg,* 107 Md.App. at 30, 666 A.2d
1253 (holding that, upon remand, the Board may consider the
imposition of those reasonable conditions that the record
reflects have already been recommended by staff and agreed
upon by appellants.)

■ While the condition does not constitute illegal contract
zoning, appellees' argument does have some appeal in that the
Zoning Ordinance appears to direct the District Council to
consider the effect of the use on current conditions. *See*
Section 27–317. Any consideration of the nature of the impact
on the locale five years from now arguably would be somewhat
speculative. We need not determine the lawfulness of the
condition, however, because, even assuming that the condition
is lawful, there was substantial evidence upon which the
District Council could find that there would be a cumulative
adverse impact from the proposed fill and an adjacent closed
fill.

According to appellees, the location of the existing and
proposed rubble fills is such that, when the rubble fills are all
completed and closed, four single family residences will be
surrounded on three sides by 100 foot mountains of rubble.[5]
By contrast, appellant's witnesses characterized the existing
and proposed rubble fills as being located on one side of these
residential properties. Our review of the plats included in the

---

**5.** While appellees characterize the existing and proposed rubble fills as
being in excess of 300 feet high, the record actually indicates that such
elevations are based on sea level and that, in fact, the elevations above
grade will be slightly in excess of 100 feet in height.

record reveals that appellant's 450 acre tract of land forms a doughnut around four single family residential properties. The residential property owners' only access to their properties is over an easement across appellant's property on Lange Lane. That access already has been severely taxed by the operation of the existing fill and will be even more taxed by the operation of the proposed fill inasmuch as the location of the entrance to the proposed fill would require truck traffic to traverse Lange Lane on a daily basis. The existing rubble fill currently occupies close to half of the doughnut and, with the addition of the proposed rubble fill, rubble fill would make up approximately three quarters of the doughnut. Thus, appellees' assertions, that they will be surrounded by rubble in the event the proposed special exception is granted, are apt.

Appellees' witnesses testified to a history of problems incident to the existing rubble fill, including problems presented by odors, noise, leachates, truck traffic and truck stacking. While the problems do not seem to have been caused by any negligence or mismanagement on the part of appellant (indeed, some witnesses testified that appellant ran a good operation and was generally responsive to the complaints of residents), they are problems typically associated with the operation of rubble fills and likely will stem from the operation of the proposed rubble fill as well. Indeed, a number of appellant's witnesses testified as such.

Even assuming that the rubble fills will not operate simultaneously, the District Council could properly have found that the proposed fill and existing fill will have a cumulative adverse impact upon the nearby residents. Ms. Finch, a landscape architect for the Park and Planning Commission, testified that the proposed mound will have an unnatural appearance, and the technical staff recommended landscape screening that would provide 100% opacity. Mr. Brenton, a landscape architect who testified as an expert on behalf of appellees, gave his opinion that the proposed mound, taken with the existing mounds, would create an industrial landscape. Mr. Brenton further testified that, based upon his observations and measurements, the landscape screening that

is proposed would not provide 100% opacity. Mr. Kieffer, one of appellant's experts, testified that the existing fill will present the potential for odors, even when finally capped. Finally, the record supports a finding of a *temporally* cumulative adverse impact.

The Zoning Ordinance provides that a rubble fill may be permitted as a *temporary* special exception. § 27–406(a). Yet, if the existing fill is completed as scheduled, it will have operated a total of seventeen years, and appellant's proposed fill would require an additional five years of operation. In addition to the obvious (e.g., twenty-two years versus seventeen years of noise, dust, traffic and odors), two examples of such temporally cumulative impact are as follows. There was testimony that the tree canopy over Cross Road Trail, which contributes to Cross Road Trail's classification as a scenic road, has been damaged by heavy truck traffic. It is reasonable to conclude that five additional years of truck traffic would further damage the tree canopy.

Even if we determined that the record is insufficient to make the issue of adverse impact fairly debatable, we would uphold the District Court's denial of appellant's Application because the record does make the issue of need fairly debatable. As we stated earlier, the Zoning Ordinance requires the technical staff to include in its report an analysis of need based on the most current available projections of residential and employment growth in the County over a fifteen year period. § 27–406(g). In addition, the Ordinance provides:

> When approving a Special Exception for a rubble fill, the District Council shall find that the proposed use is necessary to serve the projected growth in Prince George's County.

§ 27–406(h).

The record supports the zoning hearing examiner's notation that the technical staff's needs study contained considerable speculation as to the estimates of both County demand and County capacity for rubble fill. In particular, estimates of capacity and in-County versus out-of-County use of current

facilities were based upon conversations with or letters from private fill operators who may have been using different modes of measurement. Ritchie Marlboro, another rubble fill operator, simply provided its best estimate of the percentage of rubble that is generated from outside the County while maintaining that the raw data to support such an estimate was unavailable. While appellant went one step further and actually measured in-County versus out-of-County rubble for a two-week period, such measurements were based upon counting truck yards rather than more accurate in place yards, and by asking truck drivers their points of origin.[6] As the zoning hearing examiner further indicated, the demand information was speculative because of the indefiniteness of rates of compaction and recycling. Finally, the zoning hearing examiner concluded:

> Even though we could agree with Dr. Aist[']s determinations that no additional capacity is needed for 15 years, *some use* would be made of the fill proposed because such is the present experience of applicant with its adjoining rubblefill (sic).

(Emphasis added).

■ The zoning hearing examiner noted that the terms "need" and "necessary" were not defined by the Zoning Ordinance but, citing *Lucky Stores, Inc. v. Board of Appeals of Mont. Co.*, 270 Md. 513, 312 A.2d 758 (1973), and *American Oil Co. v. Board of Appeals of Mont. Co.*, 270 Md. 301, 310 A.2d 796 (1973), went on to state that such terms had been judicially defined to mean expedient or reasonably convenient and useful to the public. We agree with the District Council that the term "necessary" under the Zoning Ordinance means necessary rather than reasonably convenient or useful. *Lucky Stores* and *American Oil Co.* both involved the identical Montgomery County statute which defined "need" in terms of

---

**6.** Mr. Diltz testified that a truck yard is determined by measuring the outside of a truck container, no matter what are the contents of the container. Such a measure often is inaccurate because the trucks often are not full.

public convenience and service. *Lucky Stores,* 270 Md. at 524–25, 312 A.2d 758; *American Oil Co.,* 270 Md. at 308, 310 A.2d 796. That statute did not utilize the term "necessary." In the instant case, the technical staff and the parties all proceeded as if the determination of need involved a determination of whether there would be an actual deficit of rubble fill capacity within the next fifteen years. We believe that this is the most reasonable interpretation of the needs analysis provision. Given the flaws in the technical staff's needs analysis, the question of need was fairly debatable.

JUDGMENT AFFIRMED; APPELLANT TO PAY COSTS.