807 A.2d 156

**DAYS COVE RECLAMATION COMPANY et al.,**

**v.**

**QUEEN ANNE'S COUNTY, Maryland.**

**No. 1572, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 10, 2002.

472

**474**

Warren K. Rich (Mark F. Gabler and Rich and Henderson, P.C., on the brief), Annapolis, for appellants.

Patrick E. Thompson (Foster, Braden, Thompson & Palmer, LLP, on the brief), Stevensville, and J. Carroll Holzer (Holzer & Lee, on the brief), Towson, for appellees.

Argued before JAMES R. EYLER, BARBERA and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

RODOWSKY, Judge.

This appeal arises out of the denial by the Queen Anne's County Board of Appeals (the Board) of a conditional use (special exception) for a rubble landfill.[1] The aggrieved applicant submits that there was a want of substantial evidence to support the Board's action. Underlying this contention are two factually-interrelated legal issues—whether the denial is sustainable under the analysis required by *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981), and whether the Board encroached into areas preempted by State regulation.

In *Schultz*, the Court of Appeals explained that conditional uses result from the legislative determination that the use is "compatible with the permitted uses in a use district, but that the beneficial purposes [that conditional] uses serve do not outweigh their possible adverse effect." *Id.* at 21, 432 A.2d at 1330. The adverse effect referred to is "at the particular location proposed" and is "above and beyond that ordinarily associated with" the particular conditional use. *Id.* at 22, 432 A.2d at 1330. Thus, the Court held that

"the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any

---

1. In Queen Anne's County the three County Commissioners sit as the Board of Appeals.

adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone."

*Id.* at 22–23, 432 A.2d at 1331. The conditional use provisions of a county zoning code must be read with the holding of *Schultz* engrafted upon them. *See Mossburg v. Montgomery County,* 107 Md.App. 1, 21, 666 A.2d 1253, 1263 (1995), *cert. denied,* 341 Md. 649, 672 A.2d 623 (1996).

Days Cove Reclamation Company (DCRCo), one of the appellants, seeks to operate the landfill in an agricultural use zone on property owned by the other appellant, Springview, Inc. We shall refer to the appellants jointly as "Applicant." After hearings were conducted on three separate dates in order to accommodate the many protestants, the Board denied Applicant's request by a vote of two to one.

Applicant sought judicial review in the Circuit Court for Queen Anne's County. The circuit court concluded that some of the reasons given by the Board to support denial of the special exception were based on determinations which the State alone could make. The court further concluded that the "Board did not specifically identify those adverse impacts" which justified rejection of the proposed use under the rule of *Schultz.* Because the court could affirm only for reasons stated by the Board, see *United Steelworkers v. Bethlehem Steel Corp.,* 298 Md. 665, 679, 472 A.2d 62, 69 (1984), the court remanded the matter to the Board.

Applicant appeals from that judgment. The appellees are Queen Anne's County (the County) and persons from the vicinity who oppose the project (the Protestants). There is no cross-appeal by the appellees from the order of remand.

## I. Legal Background

Extraction and disposal industrial uses, including a rubble landfill, are permitted in the County as conditional uses in the Agricultural, Countyside, Suburban Industrial and Light Industrial Highway Service zones. Queen Anne's County Code § 18–1–025 (1996). A rubble landfill may not be located

within 500 feet of a residential zone, and it must set back 100 feet from the boundaries of the property on which the landfill is located. County Code § 18–1–132(d)(7)(v).

The County Zoning Code imposes general use standards for conditional uses of any type. Pertinent here is that found in § 13–1–131(b)(3), reading as follows:

"The proposed use at the proposed location may not result in a substantial or undue adverse effect on adjacent property, the character of the neighborhood, traffic conditions, parking, public improvements, public sites or rights-of-way, or other matters affecting the public health, safety, and general welfare."

In addition, Maryland Code (1982, 1996 Repl.Vol.), § 9–503(a) of the Environment Article (Envir) requires each Maryland county, acting individually or in conjunction with adjoining counties, to adopt a plan dealing with, *inter alia,* solid waste acceptance facilities. A sanitary landfill "whose primary purpose is to dispose of, treat, or process solid waste" is a type of solid waste acceptance facility. Envir § 9–501(n). The county plan is "a comprehensive plan for adequately providing throughout the county" facilities, including solid waste acceptance facilities. Envir § 9–501(d). County plans are to be reviewed at least once every three years. Envir § 9–503(b). The Maryland Department of Environment (MDE) may require the governing body of a county to adopt, after public hearing, and submit to MDE a revision or amendment to its county plan. Envir § 9–503(c) and (d). When a county submits its proposed county plan, or revision thereof, to MDE, MDE may approve or disapprove in whole or in part or "[m]odify or take other appropriate action on the proposal." Envir § 9–507(a).

The County has a Solid Waste Management Plan. It was amended at Applicant's request in December 1994 to include, as a proposed rubble landfill, the property that is the subject of these proceedings (the Site). The amendment recited that "[t]he facility will not be allowed to accept any material until it

receives all state, local and other required permits and approvals."

In June 1996 DCRCo applied to MDE for a permit to operate a rubble landfill at the Site. See *County Comm'rs of Queen Anne's County v. Days Cove Reclamation Co.*, 122 Md.App. 505, 713 A.2d 351 (1998) (*DCRCo I* ). It appears that DCRCo's application for a State permit is presently at the stage of MDE's review process that is described in Envir (2001 Supp.), § 9–210(a)(3) and (b), namely, MDE has ceased processing DCRCo's application awaiting the determination of the County as to whether the proposal "[m]eets all applicable county zoning and land use requirements[.]" [2]

In November 1996 a proposed ordinance was introduced before the County Commissioners that would have amended the County's Solid Waste Management Plan, reversed the action taken in December 1994, and deleted the Site as a potential rubble landfill. *DCRCo I*, 122 Md.App. at 514, 713 A.2d at 355. DCRCo obtained an injunction against the

---

**2.** Envir (2001 Supp.), § 9–210 in relevant part provides:

"(a) *In general.*—Subject to the provisions of subsection (b) of this section, the Secretary may not issue a permit to install, materially alter, or materially extend a refuse disposal system regulated under § 9–204(a) of this subtitle until the requirements set forth in this subsection are met in the following sequence:

"(1) Except for the opportunity for a public informational meeting, the Department has completed its preliminary phase 1 technical review of the proposed refuse disposal system;

"(2) The Department has reported the findings of its preliminary phase 1 technical review, in writing, to the county's chief elected official and planning commission of the county where the proposed refuse disposal system is to be located; and

"(3) The county has completed its review of the proposed refuse disposal system, and has provided to the Department a written statement that the refuse disposal system:

"(i) Meets all applicable county zoning and land use requirements; and

"(ii) Is in conformity with the county solid waste plan.

"(b) *Completion of requirements.*—Upon completion of the requirements of subsection (a)(1) and (2) of this section, the Department shall cease processing the permit application until the requirements of subsection (a)(3) of this section are met."

In Subtitle 2 of Title 9 of the Environment Article a "refuse disposal system" includes a landfill. See Envir § 9–201(e)(4).

proposed ordinance, and this Court affirmed. Based on *Holmes v. Maryland Reclamation Assocs., Inc.,* 90 Md.App. 120, 600 A.2d 864, *cert. granted,* 327 Md. 55, 607 A.2d 564, *and cert. dismissed,* 328 Md. 229, 614 A.2d 78 (1992), this Court held that "the County may not now amend the Plan to exclude the facility because of some negative reaction from community representatives. The facility's fate is the province of the MDE." *DCRCo I,* 122 Md.App. at 525, 713 A.2d at 361.

Thereafter, by Ordinance No. 99–04, effective June 18, 1999, the County amended § 18–1–132(d) of its Zoning Code, dealing with additional standards for extraction and disposal businesses, including rubble landfills, as conditional uses. All references to geology, groundwater movements, and aquifer information were deleted. See former § 18–1–132(d)(3)(ii)1, 3, 4, and (iii)(4)(i)2. Also deleted from the Zoning Code were requirements that the proposed plan of operation of the Site describe the "types of liners or other barriers to prevent movement through the soils," and the "types of leachates generated and method of managing these materials." Former § 18–1–132(d)(3)(iii)2D and E.

The 1999 amendment also limited to data "related to storm water management" a former requirement that a plan of a proposed rubble landfill include basic data concerning soils and geology. § 18–1–132(d)(4)(i)1. Also added to the Zoning Code in 1999 was the requirement that "[s]ubmittals should demonstrate that the landfills or rubble fill will not adversely affect wetlands, floodplains, or other environmentally sensitive areas." § 18–1–132(d)(7)(vi)6. The Board quoted this provision in its written opinion in this case.

## II. Factual Background

The Site is located in an agricultural zone in the northern part of the County, a little over one mile south of Millington and over three miles north of Sudlersville. A sand and gravel pit operation, formerly conducted at the Site, has been discontinued. The Site consists of fifty-eight acres of unimproved land, lying on the southeasterly side of Glanding Road, south of its acute angle intersection with Peters Corner Road. The

Site is bounded on its northeasterly side by Peters Corner Road and along its eastern boundary by railroad tracks of the Penn Central line. That right-of-way is now owned by the State of Maryland. To the south of the Site is a 143 acre farm, the frontage of which extends along the north side of Hackett Corner Road from a southern extension of the Site's eastern property line to Glanding Road.

In the northwest corner of that farm is a relatively small, separately titled parcel, zoned agricultural. It faces on the easterly side of Glanding Road and its northern boundary abuts the southwestern corner of the Site. DCRCo plans to locate a stormwater management pond in that corner. The small parcel is the home of Allen Boyles and his family. It is the closest residence to the Site. A line of trees twenty-five to fifty-five feet tall separates the Boyles's property from the Site.

On the northwesterly side of Glanding Road are three properties, owned, from south to north, by the County, by a rod and gun club, and by an electric utility. The County property was the site of a sanitary landfill which has been closed and capped for a number of years. In their report on the Site the County's Department of Planning and Zoning and Department of Public Works state that the County property is currently used as a "residential solid waste convenience center." [3] On the electric utility property is a large transfer station.

Traversing the Site in north-south and east-west directions are two power line transmission corridor easements, the former 300 feet wide and the latter 150 feet wide. In the corridors high voltage electric power lines are suspended from metal towers containing one to three cross-arms each.

The rear or west side of the County's Glanding Road property abuts a former millpond known as Unicorn Lake. At the nearest point the lake lies approximately 200 feet from

---

**3.** We were advised at oral argument that the County property serves as a collection point, principally for recyclables.

that portion of the County land that is the closed landfill, and the lake lies about 1,000 feet from the Site. The lake was formed by damming Unicorn Branch, a stream which flows from south to north. At the north end of the lake, near the dam, is a fish hatchery operated by the Department of Natural Resources (DNR). "Unicorn Millpond," *i.e.*, Unicorn Lake, is designated by MDE as a nontidal wetland of special State concern. COMAR 26.23.06.01Q(12).

DCRCo's design for the Site utilizes twenty-six out of the fifty-eight acres for disposal cells. Three cells are planned for twenty-one acres lying to the west of the electrical power transmission lines right-of-way, and a five acre cell is planned to the east of that right-of-way. Stormwater management structures complying with MDE soil conservation requirements and the County Code are to be built into the project. Containment of surface water will also be effected by a berm forty feet wide and five feet high on which trees will be planted and which will extend 3700 feet along the Glanding Road and Peters Corner Road perimeters of the landfill. Stormwater collection and management is separated from leachate collection and management.[4]

Each cell will contain a leachate collection system. The leachate drains by gravity to a sump area in the double lined bottom of the cell. The leachate then flows by gravity or is pumped to a storage facility, either a lined basin or a storage tank, from which it is transferred to tanker trucks for transport to a licensed waste water treatment plant.

Deep below the Site is the Aquia aquifer, the drinking water source for a large area. A vertical cross-section of a cell after it has been filled and closed would reveal the following levels, ascending from the subterranean to above ground:

1. The Aquia aquifer, an area of deep groundwater;

---

4. As defined in MDE regulations dealing with solid waste management, " 'leachate' means liquid that has percolated through solid waste and has extracted, dissolved or suspended material from it." COMAR 26.04.07.02(15).

2. The Calvert formation, a twenty-foot thick clay aquiclude;

3. The Columbia aquifer, an area of high groundwater;

4. A level of buffer soil extending three feet above the highest groundwater level recorded within the prior year;

5. A geosynthetic clay liner;

6. A sixty millimeter thick geomembrane liner. (Layers 5 and 6 form the double lining of the bottom of a cell.);

7. A layer of gravel of a minimum depth of two feet, *see* COMAR 26.04.07.16C(5), through which the leachate drains to the bottom of the cell for collection;

8. The rubble waste, in a series of levels, or "lifts," each not exceeding eight feet in depth, with each lift covered by at least six inches in depth of clean earth, *see* COMAR 26.04.07.18E and F;

9. A two foot thick earth cover over the highest lift to provide a smooth surface on which to place layer 10;

10. A forty millimeter thick geomembrane cap;

11. A composite drainage net (The purpose of layers 10 and 11 is to restrict stormwater from reentering the rubble once the cell is closed.); and

12. Two feet of soil with vegetation.

DCRCo estimates that the Site will be operational as a rubble landfill for five to ten years. When a cell is closed its elevation above ground level will be forty feet, according to the Board's finding.[5]

DCRCo plans to limit trucks traveling to the Site to the following route: U.S. Route 301 to Maryland Route 544, east on Route 544 to Maryland Route 313, south on Route 313 to Hackett Corner Road, east on Hackett Corner Road to Glanding Road, and north on Glanding Road to the Site. This route

---

**5.** The evidence most favorable to the appellees is that a closed cell will rise, at a maximum, approximately fifty feet above surrounding grade, according to DCRCo's engineer.

would be reversed for return trips. It avoids Millington and Sudlersville.

The State Highway Administration and the County Public Works Department have recommended that Glanding Road, presently eighteen feet wide with no shoulders, and Hackett Corner Road, presently twenty feet wide with no shoulders, be widened along the above-described route to twenty-two foot roadbeds with four foot shoulders on each side. DCRCo will make these improvements at its expense. In addition, enlarged turning radii, and lanes for traffic to bypass a left turn movement and for traffic making a right turn to merge, would be built at points along the route at DCRCo's expense. The existing rights of way are sufficient to accommodate these improvements.

In an effort to insure that customers' trucks follow the above-described route, DCRCo proposes, and the County Departments recommend as a condition, that an electronic tracking system be used. Each truck driver must obtain in advance a device utilizing technology similar to the "M–Tag" used on toll roads. When the truck arrives at the scales at the Site, information from this device will be downloaded to disclose any violations of the required route. For a second violation a driver will be denied access to the Site for one year; access will be denied permanently for a third violation.

In addition, DCRCo, as a condition of the special exception, would enter into a contract with an independent governmental authority to provide a full-time checker at the Site, to insure that only waste that is authorized to be deposited in a rubble landfill is deposited at the Site.[6]

Additional facts will be set forth in discussing particular arguments of the parties.

---

6. An independent third-party checker is a requirement for an unlined landfill under MDE regulations, but that precaution is not required for a lined landfill.

### III. The Board's Hearing and Decision

DCRCo presented a prima facie case through a corporate officer, an engineer, a traffic consultant, a real estate appraiser, an environmental consultant, and a fact witness from DNR. Representatives of the County's Planning and Zoning Department and Public Works Department presented the recommendations of those agencies for approval, subject to conditions. The Protestants presented evidence through an environmental consultant, a professor of toxicology, a realtor, a DNR manager for fresh water fisheries, the Director of Environmental Health from the County Health Department, numerous protesting citizens, and elected public officials.

In its two to one decision the Board found the following adverse effects:

"The substantial or undue effects would include [1] the forty (40) foot mound that is proposed on-site; [2] the substantial increased truck traffic, and [3] the increased speed of the trucks due to the upgrading of the existing roadways; [4] the 'human' characteristics of the various personnel that would be involved in maintaining the tracking system; [5] the additional cumulative impact of the proposed use in an area where there is already a landfill; [6] the diminished property values that would result from the second landfill and substantial truck traffic on existing residential properties; [7] the potential—and perhaps catastrophic—impacts on the adjacent Unicorn Branch and Unicorn Lake and Millpond; [8] the potential impact on drinking water in the area; [and][9] the negative impact on residential, rural roadways.

"The majority of the Board finds the testimony regarding [10] what will and will not be accepted as waste in the rubble fill is less than credible. Similarly, [11] the details of the truck tracking system seem less than efficient or reliable. [12] There are certainly other sites within the district that would have direct—or more direct—connection to a major highway, such as U.S. Route 301.[13] The up to seventy-five (75) trucks traveling the proposed rural roads,

particularly at early hours of the morning, will negatively impact on the neighborhood. [14] The majority notes with concern the adjacent residential property, school aged children, school buses, and safety factors that would adversely be affected by truck traffic. [15] The cumulative impact of two landfills will substantially impact the neighboring community by devaluing residential properties. [16] There are clearly other sites within the zone that would have a more substantial clay buffer separating the 'drinking water' aquifers, and which would not be adjacent to important natural conditions, such as Unicorn Branch and Unicorn Lake."

## IV.  Scope of Review

In reviewing the decision of an administrative agency, "we reevaluate the decision of the agency, not the decision of the lower court." *Gigeous v. Eastern Correctional Instit.*, 363 Md. 481, 495–96, 769 A.2d 912, 921 (2001) (citing *Public Serv. Comm'n v. Baltimore Gas & Elec. Co.*, 273 Md. 357, 362, 329 A.2d 691, 694–95 (1974)).  The scope of our review of administrative agency action is narrow and we are "not to substitute [our] judgment for the expertise of those persons who constitute the administrative agency." *United Parcel Serv., Inc. v. People's Counsel for Baltimore County*, 336 Md. 569, 576–77, 650 A.2d 226, 230 (1994) (internal quotations omitted).  Accordingly, this Court is tasked with " 'determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.' "  *Board of Phys. Quality Assurance v. Banks*, 354 Md. 59, 67–68, 729 A.2d 376, 380 (1999) (quoting *United Parcel Serv.*, 336 Md. at 577, 650 A.2d at 230).

With regard to questions of fact, we will only disturb the decision of an administrative agency if "a reasoning mind reasonably could [not] have reached the factual conclusion the agency reached." *Baltimore Lutheran High Sch. Ass'n v. Employment Sec. Admin.*, 302 Md. 649, 662, 490 A.2d 701, 708 (1985). Thus, "[a] reviewing court should defer to the agency's

fact-finding and drawing of inferences if they are supported by the record." *Banks,* 354 Md. at 68, 729 A.2d at 380–81.

## V. Narrowing the Issues

Although the Board expressed recognition of the *Schultz v. Pritts* requirements, the scattershot approach in the Board's decision did not distinguish between adverse effects that are common to rubble landfills and those that the Board found to be unique to the Site. Those findings that are not candidates for possibly satisfying the *Schultz* test must be culled first from the Board's list of reasons.

When the County authorized landfills as special exceptions in the agricultural use district, the County authorized a use that would be elevated substantially above ground level (fact-finding 1). Contemporary landfills no longer fill a hole to the level of the ground surrounding the hole. At the Site, the elevated landfill will be less offensive, visually, than ordinarily would be the case because high voltage electricity lines, supported by metal towers, traverse the Site.

When a location which has not been used as a rubble landfill is used as a rubble landfill, it draws trips by large trucks. Consequently, an increase in truck traffic (fact-finding 2) is not unique to the Site. Similarly, because a landfill may be located in an agricultural zone, truck travel on rural roads is implicit (fact-findings 9 and 13). Presumably the County could have adopted a zoning map or solid waste management plan that limited rubble landfills to certain locations along Route 301 (fact-finding 12), but it did not do so.

The Board's fact-findings 4, 10, and 11 appropriately might be called human frailty reasons, *i.e.*, that the checker may not check and the trackers may not track. There is no basis for concluding that the independent checker or DCRCo's employees engaged to work at the Site will be less reliable than if they were engaged to work at a landfill located elsewhere.

The appellees' real estate expert demonstrated that residential property located adjacent to a landfill is less valuable than property that is not (fact-finding 6). The appellees' expert,

however, presented no evidence that property values would be more adversely affected by a landfill at the Site than would the value of properties adjacent to or in the vicinity of a landfill elsewhere in the zone. Indeed, when one considers that the properties in the neighborhood are already adversely affected by high voltage electrical transmission lines and their supporting towers, as well as by railroad tracks, any decline in value that the proposed landfill causes at the Site would seem to be less than that near a landfill at some other location.

For the foregoing reasons we hold that fact-findings 1, 2, 4, 6, 9, 10, 11, and 13 are not candidates for possibly satisfying the *Schultz* test.

Recognizing that there must be substantial evidence under the *Schultz v. Pritts* rule to sustain the denial of the conditional use, Protestants select for emphasis the aspects set forth below:

"There were four separate and independent bases for the Board's finding the impact of this proposed rubble fill on adjoining and surrounding properties unique and different in kind or degree from that inherently associated with such a use: First, the uniqueness of the fishery aspects of Unicorn Branch and Unicorn Lake [fact-findings 7, 8, and 16]; Second, the underlying thinness of the clay strata between the Columbia and the Aquia aquifer below the proposed site [fact-findings 7, 8, and 16]; Thirdly, the uniqueness and special impacts of two landfill operations on the same road in the same community [fact-findings 5 and 15]; and finally, the impact of truck traffic upon the narrow roads accessing the subject site as opposed to a location on a major highway which would have less of an impact [fact-findings 3, 9, 13, and 14]."

Appellees' first and second supporting reasons, involving Unicorn Branch, Unicorn Lake, and the aquifers may be considered together. Appellees, by opinion testimony, undertook to show that leachate contamination of groundwater, leachate contamination of surface water, and thermal pollution adversely would affect fish in the Unicorn waters and drinking

water in the aquifers. Applicant argues, correctly in our view, that the *Schultz* requirement is not satisfied simply by identifying some unique characteristic of the neighborhood. In order for a unique characteristic of the neighborhood to support the denial of a conditional use it is necessary that the ordinary adverse effects of the conditional use be greater at the location in question, because of the unique characteristics of that location's neighborhood, than would be the case if the use were located elsewhere in the zone. Applicant submits that, although Unicorn Branch and Unicorn Lake, with their aquatic life, may be unique features of the neighborhood, there is a lack of substantial evidence that the proposed landfill will have an adverse effect on the Unicorn waters.

Applicant also argues that issues concerning whether a landfill would pollute surface and groundwater are to be decided by MDE in the State permit process, and not in a zoning case. Appellees respond that Envir § 9–210, see note 2, *supra,* which brings the State permit process to a halt until a county advises MDE that zoning and land use requirements have been met, demonstrates that there is no preemption of the County's role. Further, appellees submit that § 18–1–132(d)(7)(vi)6 of the County Code injects environmental considerations into the zoning process.

## VI. Evidentiary Sufficiency—Surface and Groundwater

### (Fact-findings 7, 8, and 16)

The Protestants produced Richard D. Klein (Klein) as their environmental science expert witness. Klein was employed by DNR from 1969 to 1987, where he rose from the position of a conservation aide to that of manager of the Save Our Streams Program. Thereafter, he has rendered consulting services through his corporation, Community & Environmental Defense Services. He holds no degrees or certifications as a hydrologist, chemist, biologist, civil engineer, or sanitary scientist.

Klein opined that there were possible adverse effects on Unicorn Branch and Unicorn Lake from the proposed rubble

landfill. He pointed out that Unicorn Branch has an abundance and diversity of fish, and in particular, it is the only stream on the Eastern Shore, south of Cecil County, in which brown trout are found throughout the year. Moreover, the DNR fish hatchery at Unicorn Lake is one of only two warm water fish hatcheries in Maryland. In addition, the State built, at considerable expense, a fish ladder at the dam forming Unicorn Lake.

Klein presented a worst case scenario of the metal content of leachate. He admittedly used, as the metal concentration in leachate, the highest concentration that he could find for a given metal, as reported in data that had been collected at forty rubble landfills.[7] The maximum levels presented by Klein exceed MDE standards for the protection of aquatic life. The landfills on whose data Klein relied were unlined landfills.[8] Because a manufacturer of synthetic liners and of closing caps for cells guarantees the life of the materials for only thirty years, Klein opined that, thirty or more years in the future, leachate containing worst case concentrations of metals would work its way to Unicorn Branch and Lake. He stated that, "[a]t that point [in time], this entire toxic brew is going to be released into the adjoining waterways."

It is well established that " 'an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant.' " *Surkovich v. Doub,* 258 Md.

---

7. A 1995 EPA study, *Construction and Demolition Waste Landfills,* estimated that there were approximately 1,800 construction and demolition landfills in the United States at that time. *Id.* at ES3.

8. At one point in his cross-examination Klein acknowledged that all of the data used in his opinion were from unlined landfills. Later in his cross-examination Klein said that he used the concentrations for chromium, zinc, mercury, lead, cadmium, silver, and copper that had been determined from samples taken in November 1995, March 1996, November 1996, February 1998, and April 1999 at a rubble landfill in Washington County, Maryland that is a lined landfill. We have been unable to reconcile this testimony with the reports from Washington County that are attached to Klein's written report. The comparison is set forth in the chart below. All data are presented in milligrams per liter.

263, 272, 265 A.2d 447, 451 (1970) (quoting *Miller v. Abrahams*, 239 Md. 263, 273, 211 A.2d 309, 314 (1965)). An expert opinion "derives its probative force from the facts on which it is predicated, and these must be legally sufficient to sustain the opinion of the expert." *State Health Dep't v. Walker*, 238 Md. 512, 520, 209 A.2d 555, 559 (1965). *See also Jones v. State*, 343 Md. 448, 682 A.2d 248 (1996) (expert testimony by police officer that he was able to identify crack cocaine by touch was nothing more than a conclusion); *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 625 A.2d 1005 (1993) (holding inadmissible auto reconstruction expert's opinion that height of bumper on truck was unreasonably dangerous, where height complied with industry standards and no scientific studies or emerging consensus supported opinion); *Wood v. Toyota Motor Corp.*, 134 Md.App. 512, 760 A.2d 315 (trial judge did not err in excluding expert testimony regarding the danger of air bags because the expert "never explained how the data upon which he relied led him to the conclusion that the size of the vent holes caused appellant's injuries"), *cert. denied*, 362 Md. 189, 763 A.2d 735 (2000); *Skrabak v. Skrabak*, 108 Md.App. 633, 673 A.2d 732 (expert's opinion regarding goodwill value of a corporation based on facts that did not support opinion and on "guesswork and speculation"), *cert. denied*, 342 Md. 584, 678 A.2d 1048 (1996). *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Klein's opinion is not substantial evidence that metals contained in leachate will adversely affect the Unicorn waters. Klein's opinion necessarily rests on the following assumptions:

—At some time more than thirty years after the closing of a cell, there will be a total failure of the synthetic liner and cover and that the second, geosynthetic clay (bentonite), lining of the cell bottom either will not have been installed or will suffer, concurrently, a catastrophic failure of un-

known origin, inasmuch as Klein gives no protective effect to the second liner in his assumption.[9]

—The failure of the cover will not be minor, *i.e.*, holes that would be capable of repair.

—The failure of the liner will not be minor, will not be detected by the monitoring system, and leakage of leachate will not be reduced by the collection system to insignificant levels.

—During the operational life of a cell, *i.e.*, when the working face of the cell is uncovered, water passing through the cell to the leachate collection system will not have eliminated the most easily removable of the metal particles in the rubble.

—The maximum concentrations of metals at unlined landfills utilized in Klein's opinion are comparable to the levels to be anticipated thirty or more years in the future at the subject rubble fill with its double lining and leachate collection system.

—The leachate would work its way as groundwater to Unicorn Branch and Lake, although the unlined municipal solid waste landfill, now closed, which is adjacent to the Unicorn waters, has had no adverse effect on their unique qualities.

—The more than 1,000 foot journey of the leachate from the Site to the Unicorn waters will occur without undergoing natural attenuation processes, including dilution and absorption.

Klein's opinion that leachate will adversely affect Unicorn waters is speculation.

Klein also presented the Board with a scenario, adversely affecting the Unicorn waters, that might take place before the hypothetical total failure of the plastic liners and covers would occur. Hypothesizing a 1.3 inch rainfall, he opined that a discharge of 8636 cubic feet of stormwater from 12.2 acres of

---

9. Bentonite is a high-swelling and low permeability clay. In theory, if water were to leak through a hole in the overlying plastic membrane, the bentonite would, on contact with water, swell and fill the hole.

the Site draining into the westernmost stormwater management basin could reach a temperature of 97°F and that the surfaces of Glanding and Hackett Corner Roads would produce a runoff at 83°F. The combined surface waters, in the witness's opinion, would cause the temperature of Unicorn Branch to rise to 72.8°F, which is above the 68°F that is the optimum temperature for trout.

The 97°F temperature was based on the maximum summertime measurement of water in three highway ponds in Anne Arundel County that are designed to discharge completely within six, twelve, and twenty-four hours. The western stormwater management basin at the Site, however, will discharge only during high volume rain storms when the temperature of the runoff will be the same as the rainfall temperature. Otherwise, the draw down from that basin will be over two to seven days, thus reducing volume discharged at any one time.

Further, Klein acknowledged that his road runoff calculation is premised upon 7.76 acres of impervious road surface, a figure which he also acknowledged included the preexisting roads, and not simply the additional surface that would result from the widening to accommodate truck traffic generated by the proposed landfill. On cross-examination the witness stated that 5.5 or 6 acres of surface area of the 7.76 acres of road utilized by him in his calculation represented the existing roads. Under *Schultz v. Pritts* a preexisting road is not attributable to the proposed conditional use. Although Klein stated that he could calculate the revised runoff using only the area of the additional surface of the widenings, we have not been directed to that evidence and have not independently found it in this voluminous record. Nor have we been directed to, or found, a revised temperature impact on Unicorn Branch, based on the revised road surface runoff.

Klein also opined that the temperature of Unicorn Branch could reach 79.2°F, well above the lethal temperature for trout of 75°F. This latter scenario assumed an increase in the volume of the discharge from the western stormwater management basin from 8,636 cubic feet to 47,829 cubic feet.

In order to increase the runoff from the Site that he determined drained into the westernmost stormwater basin, and thereby produce a trout killing temperature in Unicorn Branch, Klein assumed that the same 12.2 acres of the Site would be covered by an impermeable (but not yet disintegrated) cap. In other words, Klein assumed that the plastic cap would be placed over 12.2 acres of filled cells, but that the required two feet of soil would not have been placed over the plastic cap when the assumed 1.3 inch rain fell.

COMAR 26.04.07.18H requires that "[a] uniform compacted layer of earthen material not less than 2 feet in depth shall be placed over the final lift not later than 90 days following completion of that lift." [10] The western cell area of the Site is the twenty-one acre area that will be divided into three separate cells. Because the division is for efficiency of operation, each cell should be approximately seven acres. It is not reasonable to assume that one of the three cells would be 12.2 acres or larger and that the other two would be 4.4 acres or smaller. In order for Klein's hypothetical to be realized, *two* cells, successively, would have to be filled, covered with a plastic cap, but never covered with earth. Since the estimated operational life of the entire four cell landfill is five to ten years, Klein's scenario assumes that the first of the three western cells to be filled and covered with a plastic cap would remain exposed for better than a year, and that no soil cover would be applied until two cells had been filled. No reasonable fact finder could conclude that an area of fully exposed plastic cap would ever approach 12.2 acres.

In Klein's hypothetical scenarios, stormwater from the Site and the adjacent roads reach the Unicorn waters without any diminution in temperature or volume. Inasmuch as the two foot earth cover on a closed cell must be infiltrated by rain before the water reaches the plastic cap for collection into the stormwater system and eventual discharge, the rate of dis-

---

**10.** DCRCo's evidence is that plastic caps are usually covered with soil either immediately or within forty-eight hours after deployment and seaming.

charge from a stormwater basin is reduced by the dirt cover.[11] Nor does Klein's theory account for the cooling effect on surfaces of the initial rain in the assumed 1.3 inch storm. In addition, Klein's scenario does not account for the diminution in temperature that would occur when surface waters from the Site and adjacent roads mingle with rain as they pass over the land between those sources and the Unicorn waters. The added surface area of the public road improvements for the project is .028% of the entire Unicorn Branch and Lake watershed. The volume of the runoff from the western stormwater basin and the widened portion of the roads (assuming 1.51 acres) is .09% of the volume of the runoff into the Unicorn Branch drainage basin. These percentage calculations are uncontradicted.

Because material portions of the reasons underlying Klein's thermal pollution opinion are factually inaccurate, speculative, or both, there is a want of substantial evidence for utilizing thermal pollution to support the Board's finding that there would be adverse effects on the Unicorn waters.

Also introduced into the record through Klein was a site plan of the proposed landfill on which the witness superimposed that portion of the "Unicorn Millpond" nontidal wetland of special State concern that overlaps the Site.[12] The "Unicorn Millpond" area of special State concern extends to a portion of the Site lying between the western and eastern disposal cell areas.

A "nontidal wetland" is

"an area that is inundated or saturated by surface water or ground water at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of vegetation typically adapted for life in

11. DCRCo's evidence is that infiltration can require seven to seventy days.

12. COMAR 26.23.06.01Q(12) simply designates "Unicorn Millpond" as a nontidal wetland area of special State concern. Although DCRCo does not concede that MDE would delineate as the nontidal wetland the same area as did Klein, Klein's evidence is uncontradicted.

saturated soil conditions, commonly known as hydrophytic vegetation."

COMAR 26.23.01.01B(62). "Nontidal wetlands of special State concern" have "exceptional ecological or educational value of Statewide significance." COMAR 26.23.01.01B(63).

As relevant to the instant matter, State regulations require a 100 foot buffer around nontidal wetlands of special State concern. See COMAR 26.23.01.04A(1). At one point DCRCo's proposed use encroaches approximately twenty-five feet into the required buffer zone. The total area of all encroachments shown on appellees' exhibit is .25 of an acre. DCRCo's engineer testified that the buffer could easily be accommodated by a reduction in the "footprint," a reduction which would be demonstrated to MDE in a later phase of the permit process.

The Board did not find, as a reason for rejection of the conditional use, encroachment on a nontidal wetland of special State concern. Indeed, the Board seems to have accepted DCRCo's response to appellees' point. Encroachment on nontidal wetlands of special State concern is a non-issue on this appeal.

## VII. Preemption

### (Fact-findings 7, 8, 10, and 16)

In addition to the requirement that there be substantial evidence to support the Board's findings, the Board may not act in an area that State law has preempted through the MDE permitting process for rubble landfills. Determining where the line is drawn on the facts of this case between determinations to be made exclusively by MDE and those to be made by local government as part of the zoning process is not without difficulty.

Before a "person" may install, materially alter, or materially extend a refuse disposal system, a permit from MDE is

required. *See* Envir § 9–204(d).[13] The application must contain the complete plans and specifications for the installation. §§ 9–204(e)(1)(i) & 9–205. The Secretary of the Department of Environment "may adopt reasonable and proper regulations for submission of plans." § 9–204(b)(1). MDE may deny a sanitary landfill permit based upon a finding, *inter alia,* "that operation of the sanitary landfill system would harm public health or the environment." § 9–212.1(2). The Department may also revoke or refuse to renew the permit for an operating landfill upon a finding "that continued operation of the landfill system would be injurious to public health or the environment." § 9–214(2). Further, the Secretary may order the installation of a refuse disposal system upon findings that the absence or incompleteness of such a system

"(1) [i]s sufficiently prejudicial to the health or comfort of that or any other . . . locality; or

"(2) [c]auses a condition by which any of the waters of this State are being polluted or could become polluted in a way that is dangerous to health or is a nuisance.

Envir § 9–222(a) and (b).

The Secretary's primary response to the legislative delegation, reviewed above, is Title 26, Subtitle 4, Chapter 7 of COMAR. In applying its regulations, the Department is obliged to

"consider all material required to be submitted under these regulations to evaluate whether any of the following factors is *likely* to occur or has occurred. A person may not engage in solid waste handling in a manner which will *likely:*

. . . .

"(4) Cause a discharge of pollutants to waters of this State unless otherwise permitted under [Envir §§ 7–232 or 9–323];

---

**13.** In Subtitle 2 of Title 9 of the Environment Article " '[p]erson' includes the federal government, a state, county, municipal corporation, or other political subdivision." Envir § 9–201(d).

"(5) Impair the quality of the environment; or

"(6) Create other hazards to the public health, safety, or comfort as may be determined by the [Secretary or the Secretary's designee]."

COMAR, *supra*, Reg. 03 (emphasis added).

Regulations 13 through 18 of Chapter 7 specifically address rubble landfills and, by incorporation, the informational requirements for an application imposed by Reg. 06B(1) through (9). The latter includes information on surface waters, wells, and "the geology at the site based on available data." Reg. 06B(3)(a)-(c), (f), (g), and (7).

Review of the application is divided into three phases. DCRCo's application is currently in Phase I. The report for Phase II of the process must describe "the soils, geology, and hydrology of the proposed site." Reg. 15A. This report must "be developed and signed by a geologist who possesses at least a bachelor's degree from an accredited college or university in the field of geology or a related field of earth science." *Id.* Phase II reports must include "information in sufficient detail to permit a comprehensive review of the project." *Id.* This information includes a topographic map showing "[s]urface waters and natural drainage features," Reg. 15A(1)(a), and "[a] discussion of the geologic formations directly underlying and in close proximity to the site, the present and projected use of these formations as a ground water source, and the hydrogeologic relationship between the formations." Reg. 15A(2). "[A]ll production wells within ½ mile of the site boundary" must be surveyed, Reg. 15A(3), and at least three separate groundwater contour maps prepared and submitted. Reg. 15A(4). A Phase II report must include "[a] discussion of the potential for the vertical *and horizontal movement of pollutants* into the waters of the State." Reg. 15A(9) (emphasis added).

If an application clears Phase II of the process, the applicant must then submit complete plans and engineering reports "prepared, signed, and bearing the seal of a registered profes-

sional engineer." Reg. 16A. At Phase III MDE considers, *inter alia,*

"(11) *Methods of controlling on-site drainage, drainage leaving the site,* and drainage onto the site from adjoining areas. Erosion and sediment control provisions shall be approved by the local soil conservation district and satisfy the requirements of Environment Article, Title 4, Subtitle 1, and COMAR 26.09.01.

"(12) A contingency plan for preventing or mitigating the pollution of the waters of this State.

. . . .

"(14) A system for monitoring the quality of the waters of the State around and beneath the site. . . .

. . . .

"(20) A proposed method, engineering specifications, and plans for the collection, management, treatment, and disposal of leachate generated at the facility, including the calculations used to determine the estimated quantities of leachate to be generated, managed, stored, treated, and disposed."
*Id.* (emphasis added).

Regulation 16C regulates the cell liners and leachate collection systems. The liner is "to prevent *the migration of pollutants out of the landfill to the adjacent* subsurface soil, ground water, or *surface water.*" Reg. 16C(2) (emphasis added). MDE regulates all aspects of the liner system. Reg. 16C(3)-(7). MDE also regulates the operating procedures of rubble landfills including "Protection of Liner and Leachate Collection System," periodic, intermediate and final cover material, and "Environmental Protection." See Reg. 18B, F, G, H, and K.

Maryland appellate decisions have held that the State regulatory schemes for solid waste and for sewage sludge impliedly preempt various types of local legislation. *Holmes v. Maryland Reclamation Assocs., Inc.,* 90 Md.App. 120, 600 A.2d 864, *cert. granted,* 327 Md. 55, 607 A.2d 564, *and cert. dismissed,* 328 Md. 229, 614 A.2d 78 (1992), was a challenge by the developer of a rubble landfill to the validity of a Harford

County ordinance which removed the proposed site from the waste management plan. When the repealer was passed in May 1990 a rubble landfill was a permitted use in a number of use districts. *Id.* at 135–36, 600 A.2d at 871. Judge Alpert, writing for this Court, after a careful review of the then statutes and caselaw, held that

"the legislature intended to occupy the field of landfill regulation in a manner that limits a county's role to identifying the type of waste that may be disposed of in a rubble landfill, determining whether a proposed site is consistent with its [solid waste management] plan, and in determining whether a site meets 'all applicable zoning and land use requirements.' [Maryland Code (1987), § 9–210(1) of the Environment Article].... When the Harford County Council enacted [the repealer], it obviously did so because of a feared threat to ground water resources in the area and because of considerations related to land use compatibility. It was not a determination that the site was inconsistent with the Harford County solid waste management plan. Under the statutory scheme, as it exists between the state and Harford County, the 'specific determination concerning the hydrogeological conditions of the site and the area' was an impermissible invasion on the state's permit review prerogative."

*Id.* at 157, 600 A.2d at 882.

In reaching this conclusion this Court considered part of the planning subtitle, Envir § 9–502(c), which provides that a regulation adopted under that subtitle "does not limit or supersede any other county ... law, rule, or regulation that provides greater protection to the public health, safety or welfare." This Court said:

"Section 9–502(c) does not operate to allow a county to veto state law. Nevertheless, its terms are logically harmonious with a scheme that allocates separate domains to each government entity: the state to regulate the permit issuing process including the scientific environmental aspect of

landfill operation, and the county to regulate other aspects such as planning and zoning."

*Id.* at 147 n. 13, 600 A.2d at 877 n. 13.

After the opinion in *Holmes* was filed, the General Assembly, by Chapter 636 of the Acts of 1992, amended Envir § 9–210 to add the sequence of consideration of an application for a refuse disposal system permit that is currently set forth in Envir § 9–210(a). See note 2, *supra.*

In *Mayor & City Council of Baltimore v. New Pulaski Co. Ltd. Partn.,* 112 Md.App. 218, 684 A.2d 888 (1996), *cert. denied,* 344 Md. 717, 690 A.2d 523 (1997), the promoter of a new incinerator challenged an ordinance of Baltimore City that established a moratorium on new incinerators. This Court held that Subtitles 2 and 5 of Title 10 of the Environment Article, dealing with the state licensing scheme and solid waste management plans, respectively, "indicate an intent of the General Assembly comprehensively to occupy the field of solid waste management." *Id.* at 231, 684 A.2d at 894. The moratorium was held to be invalid because it usurped the State of "its exclusive authority over county plans and the relevant permitting process." *Id.* We also concluded that "a ban on incinerators is not a traditional area of regulation controlled by local government, except for legitimate zoning and planning reasons." *Id.,* 112 Md.App. at 231, 684 A.2d at 895.

Similar to the foregoing cases is *DCRCo I, supra,* 122 Md.App. 505, 713 A.2d 351. It was a challenge to the deletion of the Site involved in these proceedings from the solid waste management plan. In holding that the deletion was invalid, this Court undertook to synthesize the then cases saying:

"[T]he cases yield the conclusion that the legislature did not preempt by implication the field of landfill utilization with respect to traditional zoning matters, including the location of landfills. Instead of abrogating local zoning authority, the legislature enacted a statutory scheme designed to foster cooperation between the State and local authorities. Nevertheless, the actions of the County in the instant case

transcend ... traditional zoning matters ... and fall squarely within the purview of *Holmes* by breaching the 'permit' power that is specifically reserved for the State." *Id.* at 526, 713 A.2d at 361 (internal citation and footnote omitted).

The most recent pronouncement by the Court of Appeals on preemption of local law by State environmental regulation is *Soaring Vista Props., Inc. v. County Comm'rs of Queen Anne's County*, 356 Md. 660, 741 A.2d 1110 (1999), *rev'g.* 121 Md.App. 140, 708 A.2d 1066 (1998). There the promoter of a sewage sludge storage facility sought a declaration invalidating two sections of the Queen Anne's County zoning ordinance that were enacted after the promoter had obtained a State permit for the project. The plaintiff contended that these provisions, which required a conditional use permit for the sewage sludge storage facility, were preempted by Md.Code (1982, 1996 Repl.Vol.), §§ 9–230 through 9–249 of the Environment Article, as they were in effect when the State permit was granted. The suit was filed before any conditional use zoning proceedings had been conducted, and thus, unlike the present case, no reasons had yet been stated by the Board for any action on the application. The Court of Appeals held that the State statutes under which the permit had been granted preempted the County's conditional use requirement.

The Court reasoned that *Talbot County v. Skipper*, 329 Md. 481, 620 A.2d 880 (1993), presented the controlling analysis. The case involved a Talbot County prohibition against applying sewage sludge until the landowner's utilization permit from the State had been filed in the land records. *Skipper* had concluded that the State regulatory scheme relating to sewage sludge addressed a multitude of issues, was comprehensive and specific, and thereby preempted the local law. *Soaring Vista*, 356 Md. at 665, 741 A.2d at 1112. On the other hand, " '[i]n those circumstances where the General Assembly intended that local governments may act with regard to sewage sludge utilization, it expressly said so.' " *Id.* at 665, 741 A.2d at 1113 (quoting *Skipper*, 329 Md. at 492, 620 A.2d at 885) (alteration in original). Under the statutes regulating

sewage sludge that were in effect when the storage permit was granted, the General Assembly expressly had recognized the role of local zoning as to the location of sewage sludge *composting* facilities, but not as to storage facilities. *Id.* at 666, 741 A.2d at 1113. Although Chapter 611 of the Acts of 1999 had amended Envir § 9–233(1) to require that sewage sludge storage facilities also "meet[ ] all zoning and land use requirements of the county," that later statute did not govern the permit in *Soaring Vista.*

Envir §§ 9–204 through 9–229, constituting Subtitle 2, Part II, "Water Supply Systems, Sewerage Systems and Refuse Disposal Systems," are as comprehensive in their regulation as are Envir §§ 9–230 through 9–249 comprising Subtitle 2, Part III, "Sewage Sludge." Accordingly, the State statutes governing rubble landfills preempt local regulation, except to the extent specifically provided to the contrary. Consequently, we must determine which of the findings made by the Board in the instant matter fall within the express recognition of the local zoning role found in Envir § 9–210(a)(3).

The legislative history of Envir § 9–210 demonstrates that the General Assembly's recognition of a local zoning role in landfill siting was not intended to encompass all aspects of what might be considered to be environmental protection. In Md.Code (1987), Envir § 9–210 provided that MDE could not issue a permit for a landfill until:

"(1) The landfill meets all zoning and land use requirements of the county where the landfill is or is to be located; and

"(2) The Department has a written statement that the board of county commissioners or the county. council of the county where the landfill is to be located does not oppose the issuance of the permit."

Senate Bill 224 of the 1992 Session of the General Assembly proposed to alter the process for permitting refuse disposal systems to be located in charter counties or municipal corporations. As introduced the bill would have required that appli-

cation be made to the executive of the site's governmental unit who would "analyze the permit application to determine if the proposed refuse disposal system meets the environmental requirements of the county or municipal corporation...." 1992 Md. Laws at 3738. If the executive approved the application, the matter would be submitted to the legislative body with a recommendation for acceptance or rejection. If the legislative body approved the application, it would certify to MDE that certain requirements had been met, including the requirement that "the site meets the environmental requirements of the county or municipal corporation." *Id.* at 3739. Absent a favorable resolution of the legislative body of the governmental unit, MDE was prohibited from issuing any permit for a proposed refuse disposal system.

All of these provisions were stricken in the course of passage of Senate Bill 224. When enacted as Chapter 636, that legislation, in relevant part, added the three requirements and the sequence of requirements, now found in Envir § 9–210(a)(1), (2), and (3). See note 2, *supra.*

■■■ Thus, insofar as landfills are concerned, the traditional zoning and land use decisions which, under our cases reviewed above, are to be made by the local government do not include determining what is necessary in order to protect the environment from the pollutants that are generated specifically by a rubble landfill. Applying this interpretation to the evidence in this case produces varying results.

■■■ The Board found less than credible the type of waste that would and would not be accepted at the Site (fact-finding 10). This subject involves the enforcement of any State permit that might be issued, and it is not a matter of local zoning.

■■■ The evidence from John Nickerson, the Director of Environmental Health for the County Health Department, was that, because the Calvert formation is twenty feet thick at the Site, but is 100 feet thick in other parts of the County, there would be less possibility at some other location that

leachate, which in some way might enter the Columbia aquifer, would pass through the Calvert aquiclude and enter the water supply in the Aquia aquifer. This risk (fact-findings 8 and 16) is to be evaluated exclusively by MDE during the permit process.

Similarly, the risk that pollutants in leachate, such as metals, will be commingled with groundwater or surface water and produce adverse effects offsite (fact-finding 7) is for MDE's exclusive evaluation in the permit process. Indeed, the amendments to the County Zoning Code by Ordinance 99–04, which eliminated groundwater considerations, seem to recognize as much. Further, the reference in § 18–1–132(d)(7)(vi)(6) of the County Zoning Code to protection of "environmentally sensitive areas" as a consideration for denying a conditional use for a rubble landfill is preempted to the extent that that provision might be applied to the risk of an escape of rubble landfill leachate from containment.

On the other hand, stormwater management is a traditional concern of the zoning process. *See, e.g., Overton v. Board of County Comm'rs of Prince George's County,* 225 Md. 212, 170 A.2d 172 (1961); *People's Counsel for Baltimore County v. Mangione,* 85 Md.App. 738, 584 A.2d 1318 (1991); *Clise v. Phillips Coal, Inc.,* 40 Md.App. 609, 392 A.2d 1177 (1978). We interpret MDE's power to evaluate the potential for "horizontal movement of pollutants," COMAR 26.24.07.15.-A(9), and "to prevent the migration of pollutants out of the landfill to the adjacent ... surface water," Reg. 16C(2), to refer to pollutants which landfills generate, but not to include forms of pollution that are common to many types of land uses. Consequently, whether surface runoff or stormwater maintenance basin discharge will cause thermal pollution is within the power of the local zoning authorities to decide (fact-finding 7). In the instant matter, however, there was not substantial evidence to support such a finding by the Board.

We also hold that the subject matter of the Board's fact-findings that are not discussed above in this Part VII are

within the local zoning role that is excluded by Envir § 9–210(a)(3) from the otherwise general preemption effected by State law. Specifically, subject matters within the local zoning power are illustrated by the Board's fact-findings 1 through 6, 9, and 11 through 15.

## VIII. Two Landfills

### (Fact-findings 5 and 15)

The Board also based its denial of the conditional use on "the additional cumulative impact of the proposed use in an area where there is already a landfill" (fact-finding 5). The Board further found that "[t]he cumulative impact of two landfills will substantially impact the neighboring community by devaluing residential properties" (fact-finding 15). In its brief the County describes fact-finding 5 as the "[a]dditional cumulative impact of the proposal in an area in which there is an existing landfill." Appellees' (County's) Brief at 8. These findings are not supported by the evidence. It is uncontradicted that the former landfill on County-owned property on the west side of Glanding Road has been closed and capped for some time. Protestants argue that "[t]he Board further found an additional basis that the proposed site in this existing community is unique and special and that centered upon the existence of a closed sanitary landfill and a currently active transfer station directly across Glanding Road from the subject site." Appellees' (Protestants') Brief at 28. Protestants' paraphrase of the Board's finding is not what the Board literally said.

Appellees rely upon *Brandywine Enters., Inc. v. County Council for Prince George's County,* 117 Md.App. 525, 700 A.2d 1216, *cert. denied,* 347 Md. 253, 700 A.2d 1214 (1997); *Moseman v. County Council of Prince George's County,* 99 Md.App. 258, 636 A.2d 499, *cert. denied,* 335 Md. 229, 643 A.2d 383 (1994); and *Entzian v. Prince George's County,* 32 Md. App. 256, 360 A.2d 6 (1976), in each of which this Court

affirmed the denial by the zoning authority of a special exception for a landfill. Of these three decisions, only *Moseman* and *Brandywine* involved two landfills. Supporting the denial in *Entzian* were the facts that the proposed landfill abutted a natural park area and that the site contained deep ravines which sloped to the Patuxent River so that the landfill operation would destroy surface water systems, cause severe erosion problems, and potentially carry sediment and leachate directly to the Patuxent River. 32 Md.App. at 265, 360 A.2d at 11.

The application in *Moseman* sought a second landfill across the road from an existing, operational landfill. The existing landfill was permitted to operate with unlimited truck trips. 99 Md.App. at 264, 636 A.2d at 502. It was "the existence of the adjoining rubble fill currently in operation" which created the unique adverse impact at the proposed site. *Id.*

*Brandywine* involved a 450–acre site principally used for sand and gravel mining. A portion of that property had been granted a special exception in 1982 for a rubble landfill and that permission was enlarged to 177 acres in 1988. The application in the reported case was made in 1993, seeking to extend the rubble landfill by an additional 118 acres. The applicant attempted to avoid the holding of *Moseman* by contending that actual operations on the additional 118 acres would be postponed until the closing of the then existing cells that operated under the prior permission. Factors which made the additional area uniquely adverse included the fact that, when the landfill would be closed, a cluster of four homes would have 100 foot high piles of rubble on three sides. *Brandywine,* 117 Md.App. at 537, 700 A.2d at 1222. Further, there would be a cumulative adverse impact, even under the applicant's proposal, inasmuch as an active landfill operation would continue at the site for twenty-two years. *Id.* at 539, 700 A.2d at 1222. In the instant matter the landfill would not surround any residential properties and the operational life of the landfill is estimated at five to ten years.

The Applicant, on the other hand, finds comfort in *Mossburg v. Montgomery County*, 107 Md.App. 1, 666 A.2d 1253 (1995), *cert. denied*, 341 Md. 649, 672 A.2d 623 (1996). That case involved the siting of a solid waste transfer station in an industrial zone. The Board of Appeals' denial of a special exception was affirmed by the circuit court. This Court reversed, with directions that the circuit court order the Board of Appeals to grant the special exception. The site proposed for the solid waste transfer station was on the easterly side of Southlawn Creek. Across that creek was a former Montgomery County landfill and incinerator on property which drained into the same drainage basin as the proposed use. *Id.* at 14, 666 A.2d at 1260. The decision is consistent with the conclusion that the proposed solid waste transfer station in combination with the closed landfill and incinerator, did not furnish substantial evidence of a unique, cumulatively adverse effect on the neighborhood.

Photographs in evidence in the instant matter show that the closed County landfill lies somewhat below the grade of Glanding Road. The former landfill is unimproved and is covered by grass, bushes, and, in some areas, trees. Access to the receptacles constituting the "residential solid waste convenience center" is from Glanding Road via a lane which passes through a stand of trees. These trees partially screen the waste receptacles from Glanding Road.

Allen Boyles, whose property abuts the southern boundary of the Site and lies across Glanding Road from the County landfill property, built his house when the County landfill was in operation. Describing the closed landfill he said, "It's just a convenience center now for local Queen Anne's County only residents, and that's all it is. Very little trash."

On these facts, there is a lack of substantial evidence to find that the "residential solid waste convenience center," in conjunction with the Site, creates a uniquely adverse effect in this neighborhood.

## IX. Traffic Safety

### (Fact-findings 3 and 14)

The Board referred to "the increased speed of the trucks due to the upgrading of the existing roadways" as a reason for denying the conditional use (fact-finding 3). The Board's point seems to be that trucks traveling to and from the Site will be able to move more quickly than they would have been able to do were the roads not improved. Of course, the purpose of the State and County highway engineers in recommending the road improvements was to *improve* traffic safety. In any event, although the Protestants were unanimous in their concerns over truck traffic, we fail to see how the speed of trucks on trips to or from the Site will be any greater than the speed of trucks on trips to or from a rubble landfill at some other location in the zone. The economics of the shipping of rubble dictate that large trucks be used. Large trucks require roads of a certain size. Roads of a size sufficient to accommodate large trucks adequately and safely will be necessary to service a rubble landfill, wherever located. Further, the drivers of trucks traveling roads serving a rubble landfill, wherever located, are obliged to honor the posted speed limit.

In support of the denial of Applicant's request, the Board also noted with concern "the adjacent residential property, school aged children, school buses, and safety factors that would adversely be affected by truck traffic" (fact-finding 14). This finding raises a characteristic of the Site which may or may not be unique, as it bears on the safety of school children.

There are bends in Glanding Road above and below the entrance into the property of Allen Boyles and his family. He is worried that trucks using Glanding Road will strike his children, who wait at the end of his driveway to board a school bus at 7:00 a.m. and who return at 3:30 p.m. Conventional, painted signs warn motorists on Glanding Road that they are approaching a school bus stop. Nevertheless, DCRCo caused its traffic engineer to investigate the situation after the close

of the Protestants' case. In DCRCo's rebuttal case, its traffic engineer testified that DCRCo will, at its expense, cause the installation of electronic warning signs on Glanding Road that would function during the hours when children would be picked up or dropped off by the school bus.

This Court has recognized that "[v]irtually every human activity has the potential for adverse impact." *Mossburg*, 107 Md.App. at 25, 666 A.2d at 1265. Here, the Applicant's proposed additional condition to the grant of the conditional use so mitigates the risk that it cannot be considered an adverse traffic impact of the proposed landfill at the Site.

## X. Conclusion

For all of the foregoing reasons we shall reverse the judgment of the Circuit Court for Queen Anne's County and remand this matter with instructions for that court to direct the County Board of Appeals to grant the requested conditional use.

**JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE ORDER OF THE BOARD OF APPEALS AND TO REMAND THIS MATTER TO THE BOARD OF APPEALS WITH INSTRUCTIONS TO ISSUE A CONDITIONAL USE, CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY THE APPELLEES.**

| | Aquatic Life Protection Standard[A] | Maximum Concentrations[A] | Washington County Data | | | | |
|---|---|---|---|---|---|---|---|
| | | | 11/13/95 | 3/13/96 | 11/15/96 | 2/26/98 | 4/8/99 |
| Cadmium | .0039 | 2.05 | .0025 | <.05 | <.05 | <.001 | .005 |
| Chromium | (B) | .25 | .023 | <.05 | <.05 | .008 | <.05 |
| Copper | .018 | .62 | .2 | <.05 | <.05 | <.05 | .13 |
| Lead | .082 | 2.13 | .053 | <.25 | <.25 | 0 | .014 |
| Mercury | .0024 | .009 | .003 | (B) | (B) | 0 | <.0008 |
| Silver | .0041 | .03 | .002 | <.05 | <.05 | .023 | <.0025 |
| Zinc | .12 | 8.63 | .320 | <.05 | .10 | 0.16 | .06 |

[A]Per Klein's report.
[B]None reported.